[No. B164033. Second Dist., Div. Eight. Oct. 29, 2003.]

LOS ANGELES TIMES COMMUNICATIONS LLC et al., Appellants, v. LOS ANGELES COUNTY BOARD OF SUPERVISORS, Respondent.

1314

1316

**Counsel**

Davis Wright Tremaine, Kelli L. Sager, Alonzo Wickers IV, Susan E. Seager; and Karlene Goller for Appellants.

Brown, Winfield & Canzoneri, Inc., Thomas F. Winfield III, Tracy M. Noonan and Michael H. Wallenstein for Respondent.

OPINION

RUBIN, J.—

## INTRODUCTION

"People in an open society do not demand infallibility from their institutions, but it is difficult for them to accept what they are prohibited from observing. . . ." (*Richmond Newspapers, Inc. v. Virginia* (1980) 448 U.S. 555, 572 [65 L.Ed.2d 973, 100 S.Ct. 2814] (opn. of Burger, C. J.).)

With few exceptions, the Ralph M. Brown Act obligates government agencies to meet and act in public. (Gov. Code, § 54950 et seq. (the Brown Act).)[1] Richard P. McKee is president of the California First Amendment Coalition, a group dedicated to enforcing the Brown Act and the California Public Records Act. (§ 6250 et seq. (the Public Records Act).) This appeal arises from a suit filed by McKee and the Los Angeles Times against the Los Angeles County Board of Supervisors for violating the Brown Act.[2]

Appellants' petition sought a writ of mandate and declaratory and injunctive relief based on seven causes of action arising from various alleged Brown Act violations. The trial court granted appellants declaratory relief on three causes of action addressing three different Board meetings, but found for the Board on the other claims. Neither side sought appellate review on the merits of the trial court's decision. Appellants' posttrial motion for attorneys fees under the Brown Act (§ 54960.5) was denied, prompting this appeal. For the reasons set forth below, we reverse the trial court's order and remand for a new hearing to determine the amount of the attorneys fee award.

## FACTS AND PROCEDURAL HISTORY

In December 2001, County health care aides were backing a ballot measure to increase their pay (the health care or ballot measure). On December 18, 2001, the Board met in closed session with County Counsel Lloyd W. Pellman to discuss whether the County should sue to keep that measure off the ballot. The matter had been placed on the agenda as a closed session item under the Brown Act's exception for an agency's decision whether to initiate litigation. (§ 54956.9, subd. (c).) Because the merits of the proposed suit were unclear, Pellman floated the idea of provoking the health care aides to sue the

---

[1] All further undesignated section references are to the Government Code.

[2] Appellant Los Angeles Times Communication LLC does business as the Los Angeles Times. For ease of reference, we will refer to it as "the Times" and to McKee and the Times collectively as "appellants." We will refer to Los Angeles County as "the County" and to the Board of Supervisors as "the Board."

County by refusing to submit the required ballot title and summary to the Registrar of Voters (Elec. Code, § 9105, subd. (a)), thereby keeping the measure off the ballot. Four of the five supervisors present agreed and instructed Pellman to send a letter to the ballot measure's proponents stating that Pellman would not place the measure on the ballot.[3] Pellman changed his mind the next day—December 19—however, and phoned three of the supervisors to let them know he had decided to comply with the law and place the measure on the ballot.

The Board scheduled a closed session for January 4, 2002, under the Brown Act's exceptions for employee evaluations (§ 54957) and for conferences with legal counsel regarding exposure to litigation. (§ 54956.9, subd. (b).) In advance of that session, which was apparently prompted by concerns over Pellman's December 19 phone calls to three Board members, Supervisor Gloria Molina sent a letter to the other Board members on January 3, 2002, regarding the "violation of process that took place and [Pellman's] ability to represent our Board and our respective constituents in a fair and unbiased manner." According to Molina's letter, Pellman's phone calls to the other Board members on December 19, 2001, violated the Brown Act. Another closed session was scheduled for January 8, 2002, based on the Brown Act's employee evaluation exception. At both the January 4 and January 8 closed sessions, however, the Board also instructed its administrative officers to develop new protocols for closed sessions.

Based on Molina's concerns that Pellman's December 19 phone calls violated the Brown Act, the Board adopted new closed session protocols at a public Board meeting on February 5, 2002. Under those new protocols, any decision to consider a matter during a closed session had to be made by the Board's chairperson, who would approve or deny the request based upon the County Counsel's advice concerning the applicability of the Brown Act. The new protocols also directed that minutes of any closed session *actions* be kept, but that no minutes or sound recordings be made of the closed session *discussions*.

On February 20, 2002, Times staff writer Evelyn Larrubia wrote letters to Board members Molina and Yaroslavsky about these events. Larrubia's letter to Molina was a request under the Public Records Act seeking the release of all documents from Molina's office concerning the health care measure and Pellman's duties in regard to that measure. The letter to Yaroslavsky accused the Board of violating the Brown Act on December 18, January 4, and January 8 and demanded that the Board cure those violations within 30 days by releasing all documents concerning the actions taken and by publicly disclosing the positions taken by each supervisor, along with their reasons for

---

[3] Supervisor Zev Yaroslavsky was the lone dissenter.

doing so. (§ 54960.1, subd. (b).) In regard to the two January meetings, however, Larrubia's letter to Yaroslavsky was not based on the Board's direction to develop new closed sessions protocols. Instead, it was based on the Board's closed session receipt of a report by Pellman and the County's chief administrative officer about the duties of government lawyers in legal representation.[4]

The Board's executive officer, Violet Varona-Lukens, replied to the Times's Public Records Act request on February 28, 2002. In a letter to Larrubia, Varona-Lukens stated her refusal to release various documents that were responsive to Larrubia's request because they related to an employee performance evaluation and were therefore exempt from disclosure. However, those documents were inadvertently attached to Varona-Lukens's letter to the Times.[5]

On March 8, 2002, the Times published a story about the December 18, January 4, and January 8 meetings. On March 13, 2002, Pellman responded to the Times's Brown Act violation letter, contending that no such violations occurred during the December 18 and January 8 closed sessions. His letter did not mention the January 4 session, however. McKee wrote the Board on March 18, 2002, contending that the Board had violated the Brown Act on December 18, 2001. The Board did not respond to that letter. On March 26, 2002, the Times published a story describing how many of the Board's decisions were made during private staff meetings.

On March 28, 2002, the Board issued its agenda for its April 2 public meeting, including further proposed changes to the Board's closed session protocols, along with various other measures designed to improve and ensure the Board's compliance with the Brown Act and the Public Records Act. Those changes were approved by the Board on April 2, 2002. They included: (1) tape recording of all closed sessions; (2) requiring that all meetings by the supervisors' deputies be held as if the Brown Act applied to them; (3) requiring that all written materials related to Board agenda items be posted on the County's Web page; (4) an improved means of processing and responding to Public Records Act requests; (5) Brown Act training sessions for various

---

[4] The reason for this, as discussed below, is that appellants did not learn about the actual events at those closed sessions until the Board disclosed the minutes of those meetings at trial.

[5] They included a December 14, 2001, letter from Pellman to the Board concerning the expected arrival of a legal analysis of the merits of a lawsuit to stop the health care workers' ballot measure, a December 17, 2001, cover sheet to that opinion, the Board's closed session agenda and minutes from the December 18 meeting, Pellman's December 20, 2001, letter informing the Board that he had placed the health care measure on the ballot, Pellman's January 2, 2002, letter to the Board explaining the reasons why he did not follow through on keeping that measure off the ballot, and Molina's January 3, 2002, letter to the Board concerning her fear that the Brown Act had been violated on December 19.

County employees; and (6) improved descriptions of closed session agenda items in easily understood lay terms.

Appellants filed suit on March 29, 2002, one day after the agenda for the Board's April 2 meeting was posted. Relying in large part on the Board documents inadvertently sent to the Times, the petition alleged seven causes of action. The first alleged that the Board violated the Brown Act on December 18, 2001, when it secretly directed Pellman to violate the state elections code and keep the health care measure off the ballot. The second cause of action alleged that the Board violated the Brown Act as a result of Pellman's December 19, 2001, phone calls to three supervisors to discuss his decision to instead change course and place that measure on the ballot. The third and fourth causes of action alleged that the Board violated the Brown Act on January 4 and 8, 2002, by discussing the events of December 18 and 19. The other causes of action alleged that the Board violated the Brown Act by failing to specify the department head supposedly being evaluated in closed session, by using the supervisors' deputies as surrogates to hold private "shadow Board" meetings to decide the Board's business, and by holding weekly serial meetings with the County's administrative officer in order to secretly decide Board business. Based on those allegations, appellants sought injunctive and declaratory relief and a writ of mandate halting those practices.

Both before and after the petition was filed, the County took various steps to obtain the return of the documents it inadvertently sent to the Times and to prevent their use at trial. In early March 2002, the County Counsel's office demanded the return of the documents. The Board later sought to exclude those documents from the trial on the ground that they were protected by the Brown Act and were otherwise privileged, contending that based on the absence of those documents, appellants would then be unable to prove their claims. The Board also contended on the merits that its actions were in full compliance with the Brown Act. To support its contentions, the Board filed under seal numerous documents that it believed were privileged, asking the trial court to review them.

At trial, the court granted only part of the Board's motion to lodge certain documents under seal, ruling that portions of the minutes from the January 4 and 8, 2002, closed sessions, along with certain letters to the district attorney transmitting various documents, should be sealed. The court read into evidence portions of those minutes which it believed established Brown Act violations, however, disclosing for the first time that during those closed sessions the Board directed its administrative officer to develop new Brown Act protocols.

The court entered judgment for appellants on July 3, 2002, finding that the Board violated the Brown Act on December 18, 2001 when—under the guise of a closed session agenda description relating to the initiation of litigation—it discussed and acted on Pellman's suggestion to provoke a lawsuit by proponents of the health care measure by violating his legal obligation to have that measure placed on the ballot. The court found that two other separate Brown Act violations occurred on January 4 and 8, 2002, when—under the guise of closed session agenda descriptions relating to employee evaluations and the prospect of pending litigation—the Board directed its administrative officer to develop new Brown Act protocols. Although the court granted declaratory relief as to those three claims, it ruled for the Board on all other causes of action.

Appellants moved to recover their attorneys fees under the Brown Act's fee provision. (§ 54960.5.) The trial court denied the motion, finding that special circumstances existed which would make a fee award unjust. Appellants contend that the trial court abused its discretion by denying their attorneys fee motion.

## DISCUSSION

### 1.  *The Board's Brown Act Violations*

■    The Brown Act requires that most meetings of a local agency's legislative body be open to the public for attendance by all. (§ 54953, subd. (a).) The Legislature forcefully stated its intent when passing the Brown Act: "In enacting this chapter, the Legislature finds and declares that the public commissions, boards and councils and the other public agencies in this State exist to aid in the conduct of the people's business. It is the intent of the law that their actions be taken openly and that their deliberations be conducted openly. [¶] The people of this State do not yield their sovereignty to the agencies which serve them. The people, in delegating authority, do not give their public servants the right to decide what is good for the people to know and what is not good for them to know. The people insist on remaining informed so that they may retain control over the instruments they have created." (§ 54950.)

■    Among its provisions, the Brown Act requires that an agenda be posted at least 72 hours before a regular meeting and forbids action on any items not on that agenda. (§ 54954.2, subd. (a).) "The [Brown] Act thus serves to facilitate public participation in all phases of local government decisionmaking and to curb misuse of the democratic process by secret legislation of public bodies. [Citation.]" (*Epstein v. Hollywood Entertainment Dist. II Bus. Improvement Dist.* (2001) 87 Cal.App.4th 862, 868 [104

Cal.Rptr.2d 857].) Either the district attorney or any interested person may bring an action for mandamus or injunctive or declaratory relief in order to stop or prevent violations of the Brown Act "or to determine the applicability of this chapter to actions or threatened future action of the legislative body . . . ." (§ 54960, subd. (a).)

■   There are several exceptions to the Brown Act. At issue here is the one permitting a public agency to meet in closed session to discuss pending litigation. (§ 54956.9.) Litigation is considered to be pending when it has been initiated against the agency. (§ 54956.9, subd. (a).) Litigation is also considered pending when, "based on existing facts and circumstances, there is a significant exposure to litigation against the local agency." (§ 54956.9, subd. (b)(1).) For purposes of that exception, existing facts and circumstances include facts such as accidents, incidents or transactional occurrences and the receipt of claims or other threats to sue. (§ 54956.9, subd. (b)(3)(A)–(D).) The pending litigation exception also applies when, based on existing facts and circumstances, the agency has decided to initiate or is deciding whether to initiate litigation. (§ 54956.9, subd. (c).) Closed sessions are also permitted to perform employee evaluations. (§ 54957.)

The Board met in closed session on December 18, 2001, pursuant to the Brown Act's initiation of litigation exception. (§ 54956.9, subd. (c).) There is no dispute that its initial discussions about the propriety of suing to challenge the health care measure fell within this exception. The Board contended that when its focus shifted to having Pellman keep that measure off the ballot by violating his duties under the Elections Code as a means of prompting a suit by those backing the measure, it was still acting within the scope of section 54956.9, subdivision (c). The trial court rejected that contention, declaring the practice illegal under the Brown Act because "it was a topic that did not deal with initiation [of litigation]" and because "it was beyond the agenda. It was an action that should not have been taken, of course, in the closed meeting; and finally, it should have been reported."

The Board met in closed session on January 4 and 8, 2002, pursuant to the Brown Act's pending litigation (§ 54956.9, subd. (b)(1)) and employee evaluation exceptions. (§ 54957.) When the trial court unsealed the minutes of those meetings, it and appellants learned for the first time that the Board ordered the development of new Brown Act protocols during those sessions. The Board offered no defense to the consideration of Brown Act protocols in closed meetings, admitting to the court that "a mistake was made." The Board

did not cross-appeal from the judgment and effectively concedes that it violated the Brown Act on December 18, 2001, and January 4 and 8, 2002.[6]

2. *The Common Cause Decisions*

■ The court "may award court costs and reasonable attorney fees" to a successful Brown Act plaintiff. (§ 54960.5.) The first two decisions to interpret this provision were *Common Cause v. Stirling* (1981) 119 Cal.App.3d 658 [174 Cal.Rptr. 200] (*Common Cause I*) and its later companion case, *Common Cause v. Stirling* (1983) 147 Cal.App.3d 518 [195 Cal.Rptr. 163] (*Common Cause II*). Because they are also the only reported decisions to consider whether a trial court abused its discretion in denying attorneys fees to a successful Brown Act plaintiff, they provide the logical starting place for our analysis.

### A. *Common Cause I*

The *Common Cause* decisions arose after six members of the San Diego City Council sent a letter to the city manager directing him to stop trying to serve the summons and complaint in an eminent domain action the city had filed. The letter said the council planned to reopen the issue to consider whether it could avoid condemning the two properties targeted by its suit. After receiving the letter, the city manager placed on hold all efforts to serve the parties. A noticed public hearing on the issue was held four weeks later, with the council voting to formally instruct the city manager to abandon the eminent domain action. In response to complaints that the council's earlier private letter violated the Brown Act, the San Diego city attorney twice issued written opinions concluding that no such violation occurred. The public interest group Common Cause and one of its members then sued the council members for declaratory relief that the Brown Act had been violated. The trial court found that a violation occurred, but, applying the standards for awarding fees under the private attorney general statute (Code Civ. Proc., § 1021.5), denied plaintiffs' request for attorneys fees because their action conferred an insignificant public benefit.

The *Common Cause I* court held that the trial court erred by relying on the standards for awarding fees established by Code of Civil Procedure section 1021.5 because that statute was intended to provide specific guidelines for the exercise of a trial court's inherent judicial power to award fees not expressly authorized by statute. (*Common Cause I, supra,* 119 Cal.App.3d at pp. 662–663.) Instead, the appellate court held that the Brown Act's attorneys

---

[6] As discussed in detail *post,* however, the Board contends that at least as to the December 18 violation, it acted in good faith based on a legitimate difference of opinion as to the interpretation of the initiation of litigation exception.

fee provision was analogous to a variety of federal public interest statutes, including civil rights, voting rights and water pollution control laws. Those federal acts "provide for payment of attorney's fees without special qualification, because in the absence of such provision there would be little incentive to bring such lawsuits." (*Id.* at p. 663.)

In looking to federal precedent, the *Common Cause I* court was guided by *Newman v. Piggie Park Enterprises, Inc.* (1968) 390 U.S. 400, 402 [19 L.Ed.2d 1263, 88 S.Ct. 964] (*Piggie Park*), which held that attorneys fees are presumptively appropriate to successful plaintiffs under the federal Civil Rights Act (42 U.S.C. § 2000a-3(b)) unless the defendant comes forward to show special circumstances that would render a fee award unjust. (*Common Cause I, supra,* 119 Cal.App.3d at p. 663.) "Like all these [federal] cases, the Brown Act provides specific legislative authorization for attorney's fees in actions brought to enforce a public policy in a context where actual recoverable damages are likely to be trivial. The damage is to the public integrity, and the fees are designed to make it economically feasible to rectify that damage by private legal means." (*Id.* at p. 664.)

In holding that the trial court erred by denying fees based on the lack of statewide significance of the suit, the *Common Cause I* court acknowledged that Brown Act violations involving local agencies would rarely have statewide impact. "Nevertheless, regardless of the local nature of the agency, the Legislature has declared the goals of the Brown Act to be vital and of statewide significance. Section 54950 furthers the goal of public discussion and decision making in government which is inherent in a democratic political system and has been strongly supported in judicial and scholarly precedent. [Citations.]" (*Common Cause I, supra,* 119 Cal.App.3d at p. 664, fn. omitted.) According to the appellate court, the Legislature clearly intended that fees be awarded where issues of only local significance were involved. (*Id.* at pp. 664–665.)

Even so, the trial courts are not obliged to award fees in every Brown Act case and must "thoughtfully exercise" their discretion by examining all the circumstances to determine whether an award of fees would be unjust. The burden of showing such inequity rests on the defendant, however. (*Common Cause I, supra,* 119 Cal.App.3d at p. 665.) As an example, the appellate court pointed to *Aho v. Clark* (9th Cir. 1979) 608 F.2d 365, 366–368 (*Aho*), which affirmed the denial of attorneys fees under the federal Civil Rights Act "because the award of fees might have altered the consequences of the settlement reached by the parties, defendants were already in the process of remedying the program at issue and attorney's fees were not essential to attract competent counsel." (*Common Cause I, supra,* 119 Cal.App.3d at p. 665.) The appellate court also relied, without discussion or analysis, on

*Zarcone v. Perry* (2d Cir. 1978) 581 F.2d 1039, 1044 (*Zarcone*). Finally, the court held that, without limitation, other considerations which the trial court should consider included "the necessity for the lawsuit, lack of injury to the public, the likelihood the problem would have been solved by other means and the likelihood of recurrence of the unlawful act in the absence of the lawsuit." The appellate court then remanded the matter back to the trial court to reconsider whether an award of fees would be appropriate under those standards. (*Common Cause I, supra,* at p. 665.)

### B.   *Common Cause II*

On remand from *Common Cause I*, the trial court again denied plaintiffs their attorneys fees. Based on the city council's later public hearing on the matters discussed in its private letter to the city manager, the trial court found that the suit was unnecessary, that no public injury occurred, and that the problem created by the private letter had been solved by other means. Because there were no allegations of a concerted effort to avoid the law generally, combined with the trial court's earlier finding that the private letter was not part of the council's normal procedure, the trial court found that the violation was not likely to recur. The trial court also found that the public benefit from the action was insubstantial even at the local level. The plaintiffs appealed again, and the appellate court held that the trial court abused its discretion by denying their fees motion.

The *Common Cause II* court noted that the city attorney issued two written opinions concluding that no Brown Act violation occurred. In one of those letters, the city attorney wrote that it was not uncommon for council members to commence an action by way of a private letter, leading to an open and public discussion of the matter. The appellate court concluded that the latter statement rendered insupportable the trial court's conclusion that the private letter did not represent the council's normal procedure. "From the view of Common Cause the necessity for filing this action was to preclude further Brown Act violations. The lawsuit could have been avoided had the city attorney responded to the Common Cause letter [complaining of a Brown Act violation] by agreeing to advise the city council members not to take future action by means of circulated letter and/or acknowledging the previous action did violate the Brown Act. The city attorney refused to do either and, in fact, emphasized his belief the procedure was perfectly proper. Thus, there was reason to believe there would be continuing use of circulated letter agreements without judicial intervention. . . ." (*Common Cause II, supra,* 147 Cal.App.3d at p. 524.)

According to the appellate court, the lawsuit was not brought to undo the council's action but was instead brought in good faith to judicially determine

the propriety of the council's use of private, internal letters as a means of taking action and to ensure that the council's illegal procedure was not followed again. The action was therefore intended to vindicate the Brown Act's strong public policy favoring open meetings. As for the lack of a sufficient public benefit, the court held that absent the lawsuit, there was no assurance that the council would not repeat its Brown Act violation. Finally, even if the trial court were correct that a repeat violation was unlikely, "this does not support the conclusion that the public benefit from Common Cause's action was not sufficient to support an award of attorney fees. The benefit obtained through the lawsuit was not exclusively for Common Cause. The action was filed for the public benefit and the conclusion that the use of the circulated letters constituted a Brown Act violation supports a grant of attorney fees." (*Common Cause II, supra,* 147 Cal.App.3d at p. 524.)

3. *The Standard of Review and the Law of Special Circumstances*

*Common Cause I* is significant not just for its holding, but for its reliance on federal decisions interpreting attorneys fees provisions applicable to a variety of federal public interest statutes, which the appellate court believed were analogous to section 54960.5 of the Brown Act. Because *Common Cause I* relied on analogous federal statutes and case law, and because our Legislature amended section 54960.5 after both *Common Cause I* and *II* were decided (Stats. 1986, ch. 641, § 10, p. 2160), we will also look to decisions interpreting analogous federal law. (*Marina Point, Ltd. v. Wolfson* (1982) 30 Cal.3d 721, 734 [180 Cal.Rptr. 496, 640 P.2d 115] [when the Legislature amends a statute without altering provisions that have already been judicially construed, the Legislature is presumed to have known of and agreed to the previous judicial construction and the reenacted portions of the statute are construed as they were before the amendment]; accord, *Thirteen Committee v. Weinreb* (1985) 168 Cal.App.3d 528, 537–538 [214 Cal.Rptr. 297] (*Weinreb*) [plaintiffs sued under state campaign finance reform law to obtain declaration that candidate's financial disclosure statement should include certain items and sought to recover statutory attorneys fees; fee provisions in analogous federal public interest statutes were properly applied to interpret state political reform enactment that depended on private litigation as a means of enforcement].)[7] As explained below, this has led to an altered abuse of discretion standard of review.

A. *Standard of Review*

*Common Cause I* observed that the Brown Act's attorneys fee provision was enacted in 1975 in order to encourage private enforcement of the Brown

---

[7] The Board apparently agrees because, among its many contentions on appeal, it states that the trial court properly relied on factors borrowed from various federal decisions.

Act's stated policies. The fee provision was needed "to encourage private enforcement because lack of judicial interpretation hampered the act's effectiveness and penalties for noncompliance would otherwise be inadequate." (*Common Cause I, supra,* 119 Cal.App.3d at p. 663.) According to the court, section 54960.5 provides for attorneys fees "without special qualification" because absent such a provision, there would be little incentive to bring such actions. (*Common Cause I,* at p. 663.; accord, *Society of Professional Journalists v. Briggs* (D.Utah 1988) 687 F.Supp. 1521, 1523 (*Briggs*) [the legislative purpose in providing counsel fees to plaintiffs suing under public interest statutes—there, federal civil rights laws—is to vindicate those rights by private enforcement, which is best achieved by encouraging the public to act as private attorneys general; the general rule therefore holds that successful plaintiffs in such actions ordinarily recover their fees unless special circumstances would make the fee award unjust]; *Weinreb, supra,* 168 Cal.App.3d at p. 538 [applying federal law to state political reform act claim, held that "policy of encouraging vigorous enforcement through private litigation would be seriously eroded if attorney fees were to be denied to the prevailing party plaintiff in the absence of overriding special circumstances."].)

■ In order to carry out that purpose, the *Common Cause I* court endorsed the standard announced in *Piggie Park, supra,* 390 U.S. at page 402: fees are "presumptively appropriate" and a successful plaintiff "should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust." (See also *Common Cause I, supra,* 119 Cal.App.3d at p. 663.) The trial court's discretion under this standard "has been interpreted very narrowly. To act as an effective incentive for injured parties to seek judicial relief for civil rights violations, 'fee awards should be the rule rather than the exception.' " (*Ackerley Communications v. City of Salem, OR* (9th Cir. 1985) 752 F.2d 1394, 1396, quoting *Teitelbaum v. Sorenson* (9th Cir. 1981) 648 F.2d 1248, 1251 (*Teitelbaum*).) An abuse of discretion exists where the trial court either misperceives the law or does not consider relevant factors and therefore misapplies the law. (*Ackerley,* at p. 1396.)

■ In short, the trial court has the discretion to deny successful Brown Act plaintiffs their attorneys fees, but only if the defendant shows that special circumstances exist that would make such an award unjust.

### B. *The Law of Special Circumstances*

As one might imagine, given the variety of federal laws subject to private enforcement, the fact patterns justifying a denial of fees vary greatly. Nevertheless, a few basic guidelines have emerged. In *Briggs,* the District Court gave the following examples:

" Instances in which special circumstances were found to justify a denial of a fee award include outrageous conduct on the part of plaintiff, and situations in which a defendant is powerless to provide the remedy sought by plaintiff. Other instances where counsel fees were denied include circumstances wherein plaintiff's claims were clothed as [42 U.S.C.] § 1983 actions but clearly were state law claims, and where plaintiffs, with the barest standing, attacked an antiquated rarely-enforced curfew statute without prior attempts to remedy the grievance without litigation." (*Briggs, supra,* 687 F.Supp. at p. 1524, fns. omitted [federal civil rights claim].) *Briggs* itself involved a challenge to a long-accepted Utah practice of allowing government litigation settlement agreements to remain confidential. The court acknowledged that, if the public entity had released the settlement agreement in question to the public without court order, the government would have presumptively breached the settlement agreement's confidentiality provision, thus exposing the government to "substantial damages." This factor justified the denial of attorneys fees. (*Ibid.*)

The Fifth Circuit has also recognized that denial of fees due to special circumstances arises only in unusual situations. "For example, several cases upholding decisions to deny attorney's fees involve situations in which the plaintiff filed under [42 U.S.C.] section 1983 to recover what was essentially a tort claim for private monetary damages. These suits did not require injunctive relief or confer significant civil rights to the public. [Citations.]" (*Riddell v. National Democratic Party* (5th Cir. 1980) 624 F.2d 539, 544 (*Riddell*).) Among the decisions cited by *Riddell* for this proposition were *Zarcone, supra,* 581 F.2d at pages 1042–1045 (courthouse coffee vendor sued for civil rights violation after judge ordered plaintiff brought to chambers in handcuffs, where judge berated plaintiff for brewing lousy coffee), and *Chastang v. Flynn & Emrich Co.* (4th Cir. 1976) 541 F.2d 1040, 1045 (*Chastang*) (male employees successfully sued on their own behalf for sex discrimination in pension benefits; fees properly denied because the plan was legal when first implemented, the defendant employer did not have unrestricted right to change the plan, the plan was amended to eliminate the discrimination before plaintiffs sued, and defendant had no financial interest in the plan and therefore lacked incentive to discriminate).

*Riddell* also cited to cases where special circumstances existed justifying a denial of attorneys fees because plaintiffs' efforts did not contribute to their litigation success. Among the decisions cited were *Aho, supra,* 608 F.2d 365, which was relied upon by both *Common Cause I* and the trial court here.

*Aho* was a federal civil rights class action alleging that Hawaiian school board officials violated federal guidelines by providing an inadequate school breakfast program. Suit was filed within weeks after the school board

implemented the program. Seven months later, the parties settled and entered a consent agreement that obligated the school board to conduct a survey, tabulate the results, and implement the program in schools that desired to participate. The consent agreement expressly left undetermined whether the board's existing program violated state or federal guidelines. It was also silent on the issue of the plaintiffs' attorneys fees. When plaintiffs' fee motion was denied, they appealed, prompting a cross-appeal from the school board in order to unwind the consent agreement.

The Ninth Circuit held that the district court did not abuse its discretion in denying plaintiffs their fees because special circumstances made such an award unjust. The *Aho* court relied heavily on the absence of a fees provision in the consent agreement, concluding that plaintiffs must have compromised in order to avoid the risk and expense of further litigation. Awarding fees in that circumstance "would alter the consequences of that compromise and would thus be manifestly unfair to [defendants]." (*Aho, supra,* 608 F.2d at p. 367.) Further, the statutory attorneys fee provision did not take effect until four months after the suit was filed and just two months before it was settled. Under the law as it existed during much of the negotiations, the plaintiffs would not have been entitled to recover their fees unless the defendants were found to have acted in bad faith. Because the defendants may well have believed that they were not liable for fees, and because they contended they would not have settled if they had known plaintiffs would seek to recover their fees, a fee award "would be unduly harsh." (*Ibid.*)

Finally, the *Aho* court considered the statutory purposes of the federal attorneys fee statute: "Although the class of children who might benefit from the school breakfast program is a large one, we are not persuaded that an award of attorneys' fees was ' "essential to attract competent counsel." ' [Citation.] [Defendants] were already in the process of establishing a breakfast program at the time this suit was filed. Nor can we conclude that appellants' suit was essential in order to bring the existing program within federal standards, since that determination was expressly left unresolved by the consent agreement. Furthermore, [defendants] did not manifest bad faith or obdurate conduct; they were apparently quite willing to expand the breakfast program. In these circumstances, the policies underlying the [civil rights fees] Act do not mandate an award of attorneys' fees." (*Aho, supra,* 608 F.2d at pp. 367–368.)

With these guiding principles in mind, we next conclude that there were no special circumstances to justify the trial court's order denying appellants their fees.

### 4. *The Absence of Special Circumstances Mandates a Fee Award*

Tracking both *Common Cause I* and *Aho*, the trial court denied appellants their fees for three reasons. First, their suit was unnecessary. Second, there was insufficient public injury. Third, attorneys fees were not needed to attract competent counsel because the Times had "plenty of incentive, other than attorneys' fees, to bring this action." The first two findings are a blend of several factors: the fact that the Board corrected its December 18 violation one day later when Pellman changed his mind, followed by its January 4 and 8 closed sessions initiating a series of protocols designed to improve the Board's Brown Act compliance; the fact that the Board's final changes to its Brown Act protocols—two days after appellants filed suit—were posted as agenda items the day before suit was filed; the existence of a good faith dispute as to whether a Brown Act violation occurred; and the unlikely recurrence of the violations, as shown by the absence of a recurring policy, the unusual and specific factual setting which gave rise to the Board's violations, and the Board's eventual steps to improve its Brown Act procedures. As we explain below, we conclude that the trial court erred.

Critical to the trial court's order was its finding that the Board remedied its Brown Act violations when Pellman shifted gears on December 19 and when the Board adopted new Brown Act protocols before appellants sued. Based on this, the trial court concluded that no repeat violations were likely and that the action was unnecessary and conferred an insufficient public benefit to justify an award of fees. We disagree with the trial court both factually and legally.

First, Pellman's change of heart the day after the Board voted to have him violate state election laws was not based on his belief that a Brown Act violation occurred on December 18. Neither was Supervisor Molina's initiation of new Brown Act procedures on January 4 and 8. Instead, as the Board's records show, it was prompted by Molina's belief that the Brown Act had been violated on December 19 when Pellman phoned three Board members to discuss his decision to comply with the election laws.

Nor did the Board's later adoption of new Brown Act protocols remedy the situation. At the time suit was filed on March 29, 2002, the Board had initially adopted a new protocol which barred the taking of discussion minutes or the tape recording of closed sessions. The new protocols also left it to the Board chairperson, acting on the advice of county counsel, to decide whether a matter was properly slated for closed session under the Brown Act. However, County Counsel Pellman was then demanding the return of the documents that were accidentally disclosed to the Times while insisting that no Brown Act violations occurred. Based on this, appellants could properly

conclude that their action was necessary because (1) the Board had now made it impossible to learn what happened during a closed session by barring the taking of discussion minutes or audiotapes during closed sessions; and (2) given Pellman's insistence that no Brown Act violation occurred, along with his attempts to have the Times return the wayward documents and the Board's stated intention to rely on county counsel's advice when determining whether a matter could be discussed in closed session, there was a real possibility that the same violations might reoccur.

Although the Board's subsequent April 2, 2002, vote permitted the taping of closed sessions and made other improvements in the Board's Brown Act procedures, that action was taken after suit was filed. On May 8, 2002, Pellman submitted to the Board a comprehensive memo on the proposed new protocols. (See *Spencer v. General Elec. Co.* (E.D.Va. 1989) 706 F.Supp. 1234, 1243 [defendant's revised sex harassment policy was not yet completed when plaintiff filed suit].) Even if the Board's actions after appellants sued somehow related back to the Board agenda posted the day before suit was filed, the final version of its Brown Act protocols was deficient because it still relied on Pellman's advice to determine whether the Brown Act applied. As noted, Pellman continued to maintain that no Brown Act violations occurred, sought the return of documents showing the December 18 Brown Act violation, defended this action in part on the basis that without those documents there was no proof of a violation, and tried to keep under seal the January 4 and 8 minutes which ultimately established that violations occurred on those dates.[8] Ultimately it required a trial to disclose all the documents and determine that the Board had violated the Brown Act three times.

These facts are far different from cases such as *Aho, supra,* 608 F.2d 365, where the defendant's willingness to settle played an important role in the Ninth Circuit's holding that special circumstances existed. This was made clear by the *Aho* court's statement that it would have been inclined to award plaintiffs their fees had the defendant taken the matter to trial. (*Id.* at p. 367.) Another important factor in *Aho* was the parties' settlement, which expressly left undetermined whether defendants had violated the law, leaving the district court unable to conclude that the suit had been necessary. (*Id.* at pp. 367–368.) Nor is it like *Chastang, supra,* 541 F.2d at page 1045, where fees were denied because the employer acted "with reasonable dispatch" to correct violations "as soon as a murky area of the law was clarified[]" before suit was filed.

---

[8] The Board's trial brief also relied on the County district attorney's May 2002 opinion letters in response to complaints about the Board's conduct, which concluded that no Brown Act violations occurred.

Instead, the facts are much more like those in *Common Cause II*. As in that case, the agency's legal counsel—Pellman—along with the district attorney, opined that no Brown Act violations occurred. Rather than acknowledge the violations and agree not to do so again, the Board and Pellman resisted appellants' legal challenge, forcing the matter to trial and judgment. Protocols that gave Pellman a major voice in determining whether the Brown Act applied in any particular situation were not likely to prevent an immediate reoccurrence of Brown Act violations given Pellman's insistence that the Board had committed no violation and the documents should be returned. The trial court was therefore wrong when it found that this action was unnecessary. (*Common Cause II, supra,* 147 Cal.App.3d at pp. 523–524; see *Best v. California Apprenticeship Council* (1987) 193 Cal.App.3d 1448, 1467 [240 Cal.Rptr. 1] (*Best*) [trial court erred by denying plaintiff his attorneys fees in federal civil rights action because, unlike *Aho,* defendants were not willing to meet plaintiff's demands by promptly settling, forcing plaintiff to litigate]; *EWAP, Inc. v. City of Ontario* (1986) 177 Cal.App.3d 1108, 1115–1116 [223 Cal.Rptr. 422] [defendant city's promise not to enforce challenged adult bookstore ordinance came after assertion in pleadings that it might enforce the law and defendant finally concluded ordinance was unenforceable as a direct result of the litigation; trial court therefore erred by concluding that same results would have occurred absent the suit].)

We disagree with the trial court that the net result of this litigation conferred insufficient public benefit because there was no injury apart from the three violations themselves. As discussed earlier, the litigation was necessary to uncover the January 4 and 8 violations. The trial court found those violations insignificant because they initiated an overhaul of the Board's Brown Act compliance procedures. We believe the trial court overlooked the timing and context of those two meetings, which occurred before any public disclosure of the events of December 18, 2001. Their purpose was to rectify a different perceived Brown Act violation and led to the adoption of new protocols in February that included a ban on discussion minutes or audiotapes of closed sessions. It was only after the events of December 18 became public that the Board undertook the further revisions of its Brown Act protocols. We also find the court's reasoning unpersuasive because, as discussed earlier, those changes did not address the December 18 violation and, given the Board's continued resistance to appellants' assertions, left open the possibility that the same violation could recur. Finally, we reject the notion that it was somehow proper to violate the Brown Act in order to save the Brown Act.

■ Even though appellants lost on four of their causes of action and did not obtain injunctive or writ relief, the Brown Act expressly permits actions to "determine the applicability" of the act. (§ 54960, subd. (a).) As a result of their petition, appellants also obtained a declaration that the Board's actions

on December 18, 2001, were illegal, thus clarifying the scope of the Brown Act's initiation-of-litigation exception. To paraphrase the *Common Cause II* court, this action was brought to judicially determine the scope of that exception and, absent appellants' lawsuit, neither they nor any other person could be assured that further such Brown Act violations would not occur.[9] (*Common Cause II, supra,* 147 Cal.App.3d at p. 524; see *Weinreb, supra,* 168 Cal.App.3d at p. 538 [order denying successful plaintiffs their attorneys fees in campaign finance reform act action reversed because judicial determination that campaign finance reform act required candidates to make certain disclosures provided sufficient public benefit].) We therefore believe that denying appellants their attorneys fees would be contrary to the legislative purpose behind section 54960.5. (*Common Cause I, supra,* 119 Cal.App.3d at p. 663 [the purpose of section 54960.5 was to "encourage private enforcement because lack of judicial interpretation hampered the act's effectiveness.")]; *J & J Anderson, Inc. v. Town of Erie* (10th Cir. 1985) 767 F.2d 1469, 1474, overruled on other grounds by *Dennis v. Higgins* (1991) 498 U.S. 439 [112 L.Ed.2d 969, 111 S.Ct. 865] [purpose of federal civil rights fees act was to encourage the bringing of suits in new and undeveloped areas of law].)

■ We also reject the trial court's reliance on the Board's supposed good faith in defending its action as a special circumstance justifying the denial of appellants' attorneys fees.[10] Although cases such as *Aho, supra,* 608 F.2d 365, and *Zarcone, supra,* 581 F.2d 1039, mentioned a defendant's good faith as grounds for denying a plaintiff his fees, later federal and state decisions have clarified that this is not so. In *Teitelbaum, supra,* 648 F.2d 1248, the Ninth Circuit held that while good faith may be a factor to consider, standing alone it is not a special circumstance. (*Id.* at pp. 1250–1251.) The Ninth Circuit reasoned that a contrary rule would defeat the underlying policy of the federal civil rights attorneys fees act, which was designed not to punish defendants, but to encourage individuals to seek judicial relief. (*Id.* at p. 1251.) "To act as an effective incentive, fee awards should be the rule rather than the exception. Denying fees where a defendant acts in good faith will defeat this aim since most defendants will be able to demonstrate at least colorable good faith." (*Ibid.*) California appellate courts have not only interpreted federal fee provisions the same way (*Best, supra,* 193 Cal.App.3d at pp. 1466–1467 [federal civil rights claim]; *Schmid v. Lovette* (1984) 154 Cal.App.3d 466, 475–476 [201 Cal.Rptr. 424] [same]), they have rejected the use of a defendant's good faith as a special circumstance when determining

---

[9] Even if recurring violations were unlikely, the judicial determinations obtained by appellants conferred a sufficient public benefit to compel an award of fees. (*Common Cause II, supra,* 147 Cal.App.3d at p. 524.)

[10] Appellants do not challenge the trial court's finding that the Board's defense of its actions was in good faith. As noted, the Board has not appealed the finding that it violated the Brown Act. Accordingly, neither issue is before us and we assume, without deciding so, that the Board acted in good faith.

whether attorneys fees were proper under different state laws. (*Weinreb, supra,* 168 Cal.App.3d at pp. 537–538 [relied on federal law to hold that good faith not a special circumstance under state campaign finance reform laws]; *Schmid v. Lovette, supra,* at pp. 475–476 [looking to federal law, rejected good faith as special circumstance under private attorney general fees provisions in Code Civ. Proc., § 1021.5].)[11]

The final reason the trial court gave for denying appellants' fee motion was that "the *Aho* factor (cited in *Common Cause II*) that attorneys' fees were needed to attract competent counsel, does not apply here. LA [T]imes had plenty of incentive, other than attorneys' fees, to bring this action." The *Aho* court did mention that as a factor, but without meaningful discussion or analysis. (*Aho, supra,* 608 F.2d at pp. 367–368.) This was cited in *Common Cause I,* along with a citation to *Zarcone, supra,* 581 F.2d 1039, 1044. (*Common Cause I, supra,* 119 Cal.App.3d at p. 665.) The trial court's reliance on this factor was misplaced for two reasons. First, the rule applies to plaintiffs who sue for money damages and are represented by private counsel retained under a contingent fee agreement. (*Buxton v. Patel* (9th Cir. 1979) 595 F.2d 1182, 1184–1185; *Zarcone, supra,* 581 F.2d at pp. 1043–1044 [where plaintiff sues for damages and prospects of success are bright enough to attract competent private counsel on contingent fee basis, fee award may be denied; where plaintiff sues for relief other than damages, however, the *Piggie Park* rule applies].) Because appellants hired private counsel on an hourly rate basis in order to obtain declaratory and other nonmonetary relief, that rule is plainly inapplicable. ■ Second, later cases have made clear that a plaintiff's ability or inability to pay private counsel are not special circumstances that would justify denying a fee award in civil rights cases. (*Hamner v. Rios* (9th Cir. 1985) 769 F.2d 1404, 1407 [noting that later two cases undermined *Buxton*'s "bright prospects" rule]; *Riddell, supra,* 624 F.2d at p. 543; *Briggs, supra,* 687 F.Supp. at pp. 1523–1524.)

■ We think the rule is a good one and should apply to the Brown Act. Given the strong public policy behind that act and the need to spur private enforcement through an award of attorneys fees (*Common Cause I, supra,* 119 Cal.App.3d at p. 663), we see no reason to distinguish between a well-funded major metropolitan newspaper and those with fewer resources. Even the well-heeled should be encouraged to enforce the Brown Act for the public's benefit with full assurance that, absent special circumstances, they, too, will recover their attorneys fees.

---

[11] In connection with this, we note that even though the private attorney general fee statute does not set the standards applicable to the Brown Act's section 54960.5 (*Common Cause I, supra,* 119 Cal.App.3d at pp. 662–663), the private attorney general statute is still analogous to the Brown Act's fee provision. (*International Longshoremen's & Warehousemen's Union v. Los Angeles Export Terminal, Inc.* (1999) 69 Cal.App.4th 287, 303 [81 Cal.Rptr.2d 456].)

## DISPOSITION

For the reasons set forth above, the order denying appellants their attorneys fees is reversed. The matter is remanded to the trial court with directions to hold a hearing on the proper amount of fees to be awarded. Appellants are to recover their costs on appeal, including their appellate attorney's fees. (See *International Longshoremen's & Warehousemen's Union v. Los Angeles Export Terminal, supra,* 69 Cal.App.4th at p. 304.)

Cooper, P. J., and Boland, J., concurred.

Respondent's petition for review by the Supreme Court was denied February 4, 2004. George, C. J., did not participate therein.