Filed 7/25/13  Bolander v. Bolander CA1/2
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| RINSKE BOLANDER,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>FREDERICK BOLANDER,<br><br>    Defendant and Appellant. | A133834<br><br>(San Mateo County<br>Super. Ct. No. CIV 492551) |
| RINSKE BOLANDER,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>FREDERICK BOLANDER,<br><br>    Defendant and Respondent. | A134509<br><br>(San Mateo County<br>Super. Ct. No. CIV 492551) |

Plaintiff Rinske Bolander (Rinske) sued her now ex-husband, defendant Frederick (Rick) Bolander, for domestic violence after he twice drugged her with Ambien and engaged in nonconsensual sexual intercourse with her while she was incapacitated.[1]  A jury found in favor of Rinske, awarding her $30,000 in economic damages, $175,000 in noneconomic damages, and $200,000 in punitive damages, for a total award of $405,000.

After the trial, Rinske filed a motion for attorney's fees, seeking $455,600 plus a 1.5 multiplier, and a memorandum of costs seeking $155,622.  The trial court denied

---

[1] For clarity, and as is common in cases involving spouses, we refer to the parties by their first names.  We intend no disrespect.

1

Rinske's fee request and, on Rick's motion to tax costs, awarded Rinske only a fraction of the costs requested.

Both sides appeal. Rick's appeal asserts multiple errors that he claims require reversal of the judgment. We reject his arguments, and we affirm the judgment.

Rinske's appeal argues that the trial court abused its discretion in denying her request for attorney's fees in its entirety and in rejecting a substantial portion of her costs. We conclude that, based on a misunderstanding of the applicable law, the trial court abused its discretion in ruling on Rinske's requests for fees and costs. We therefore remand for the trial court to reconsider Rinske's motion for attorney's fees and Rick's motion to tax costs in a manner consistent with this decision.

## FACTUAL BACKGROUND

Rick and Rinske met in 1995 and dated for two years before marrying in 1997. The relationship was characterized by an active sex life, with Rick having very high expectations concerning the frequency of sexual intercourse. He expected sex "every day or sometimes twice a day" when he was not away on business.

The marriage produced four children, all very close in age.[2] By the time Rinske had their second child, she was worn out from the demands of motherhood. Despite her exhaustion, Rick maintained very high expectations in terms of their sex life. His sexual demands were becoming a burden to Rinske, and by 2006, the marriage was strained. The couple sought help from a marriage counselor, and Rinske began to communicate to Rick that she needed rest and that she wanted to have sex less frequently. Despite her request, Rick's expectations did not lessen. In fact, his demands increased, and he wanted to have sex with Rinske "a couple different times every morning and every evening." Rinske felt worn down by his demands, and began to reject Rick's advances more and more. Rick took it personally and became angry.

---

[2] At the time of the incidents that were the subject of Rinske's lawsuit, the children were three, five, six, and seven years old.

By early January 2007, after a weekend away when the couple had intercourse seven times, Rinske told Rick that she was no longer able to acquiesce in his sexual demands.  She wanted him to treat her with respect and to recognize and honor her needs and feelings.  She began sleeping on a small cot in the youngest child's nursery instead of in the master bedroom with Rick.  Rick responded with anger and isolation, questioning Rinske's love for, and commitment to, him.

On March 7, 2007, Rick, who had been traveling for work, arrived home around 8:00 p.m., after the children had gone to bed.  He opened a bottle of red wine in the kitchen and, out of Rinske's view, poured her a glass.  Unbeknownst to Rinske, Rick then put one-half of an Ambien tablet in the wine.[3]  After drinking the glass of wine, Rinske "fell asleep and . . . kind of nodded [herself] awake."  As she described it at trial, "I didn't feel well, but I was also very concerned that I fell asleep because I had never nodded off, you know—even given all the strange hours with all the kids, I never nodded off at the table, but I kind of nodded myself awake.  I did not feel well.  I felt very nauseous and light-headed and dizzy.  And I just did not feel well.  I didn't know what was happening."

Because Rinske felt ill, she told Rick she was going to go to bed.  She walked upstairs to the bedroom and "just fell in bed."  The next thing she remembered was Rick on top of her having sex with her.  She was unable to speak or move her arms:  "I remember not being able to move my arms.  And I remember not being able to speak.  I remember feeling like I was under water.  And my vision—I could see directly in front of me but not—everything else was kind of faded out, but I couldn't move."  She did not want to be having sex with Rick, and she was terrified because she was "frozen."

Rinske's next memory was waking up in the morning and immediately asking Rick if they had had intercourse.  He told her they had, describing it as "wonderful."  She asked if he had worn a condom, and he told her, with a smile, he had not.  Rinske feared he was trying to get her pregnant so she would not leave him.

---

[3] Rick obtained a prescription for Ambien from a former fraternity brother who was a physician.  He filled the prescription on March 7, 2007, the same day he drugged Rinske for the first time.

Rinske then went into the bathroom to take a shower.  In the shower, she fell down when she closed her eyes to rinse her hair.  She lost her balance and "felt very disoriented like the room was spinning . . . ."

A second, similar incident occurred seven weeks later.  On the evening of April 22, 2007, Rick poured Rinske a glass of wine to drink with dinner.  Again, he laced it with Ambien without Rinske's knowledge.  After the children went to bed, Rick and Rinske sat down to watch a movie in the family room, with Rick getting up during the movie to get them more wine.  As they were watching the movie, Rinske suddenly experienced double vision, so she sat up and tried to regain her normal vision.  An erotic scene set in a strip club then came on, and Rick moved next to Rinske on the couch, telling her that the scene was exciting and he wanted to touch her.  She told him to focus on the movie because she did not want to have sex.  She suddenly felt "really drunk," "wasted," "just like a rag doll."  Despite Rinske having told Rick she did not want to have sex, he unbuttoned her shirt and began to fondle her.  Rinske was "completely out of it" and could not say "No," or tell him to stop.  Rick performed oral sex on Rinske, and then forced her to perform it on him, only stopping when she gagged from his forceful thrusting.  He then engaged in sexual intercourse with her, first from the front and then from the back, at one point forcing her head down onto the ottoman and pulling her hair tight.  Rinske's last memory of the incident was seeing the gray leather of the ottoman.

When Rinske woke up the next morning, she was in the master bedroom.  She felt "heavy-headed," "off-center," and disoriented.  Rick, who was in the room getting ready for work, described their sex of the night before, again proclaiming it "wonderful."

On April 27, five days after the second incident, Rinske walked in on Rick in the kitchen as he was slipping Ambien into a glass of red wine he had just poured for her.  Although he initially denied it, he subsequently admitted that he had put Ambien in her wine on the two prior occasions, claiming he did it to reignite the love they had and save their relationship.  He maintained, however, that the sex was consensual.

As a result of the incidents, Rinske suffered severe emotional distress and physical manifestations in the form of posttraumatic stress disorder (PTSD) that required extensive therapy.

## PROCEDURAL BACKGROUND

On March 3, 2010, Rinske filed a complaint alleging four causes of action: (1) spousal rape (Pen. Code, § 262); (2) sexual battery (Civ. Code, § 1708.5[4]); (3) domestic violence (§ 1708.6); and (4) intentional infliction of emotional distress. Rick answered on April 9.

On June 27, 2011, Rinske dismissed her first, second, and fourth causes of action, apparently because they were barred by the statute of limitations. As a result, only her claim for domestic violence under section 1708.6 remained.

On June 30, 2011, Rick filed a motion for judgment on the pleadings, seeking dismissal of Rinske's domestic violence claim. He argued that her allegations did not constitute domestic violence because she did not allege bodily injury. Instead, they could only be asserted as a claim for sexual battery under section 1708.5, which claim she had already dismissed as time-barred. The trial court denied Rick's motion.

Trial commenced with jury selection on July 5, 2011. Testimony began on July 12 and concluded after seven days of testimony. After both parties had rested, Rick moved for a directed verdict, again arguing that due to the absence of bodily injury, Rinske's claim did not fit the elements of domestic violence but rather described sexual battery, which claim was time-barred. The trial court denied this motion as well.

Following closing arguments on July 21, the jury briefly deliberated before retiring for the day. The next day the jury returned with a verdict for Rinske, awarding her $30,000 in economic damages, $175,000 in non-economic damages, and $200,000 in punitive damages, for a total award of $405,000.

---

[4] All subsequent statutory references are to the Civil Code except where otherwise stated.

5

After trial, Rick filed motions for judgment notwithstanding the verdict and new trial. Both argued that Rinske failed to establish that he intentionally or recklessly inflicted physical harm upon Rinske or caused her apprehension of serious bodily injury. Both were premised on his previously urged—and previously rejected—argument that Rinske's domestic violence claim was not properly before the jury because her evidence did not fit the elements of such a claim. Instead, he again contended, her allegations fit a claim for spousal rape or sexual battery, both of which she had dismissed prior to trial as barred by the statute of limitations. On October 25, 2011, the trial court denied both motions.

Meanwhile, as will be detailed below, on August 19, 2011, Rinske filed a memorandum of costs seeking $155,622, and on September 8, 2011, she moved for attorney's fees of $455,600 plus a 1.5 multiplier and $10,000 for the fee motion itself. The trial court denied her fee request and, on Rick's motion to tax costs, rejected a majority of her requested costs. An amended judgment was entered on December 22, 2011, awarding Rinske $17,280 in costs.

Both parties timely appealed, Rick from the judgment, and Rinske from the orders denying her fees and taxing her costs and from the amended judgment. We ordered the appeals consolidated.

## DISCUSSION—RICK'S APPEAL

### A. Sexual Assault Is Actionable Under the Domestic Violence Statute

In what one might consider Rick's primary argument—a lengthy one consuming 14 pages of his opening brief—he contends that Rinske's section 1708.6 domestic violence claim was not properly before the jury. This argument is premised on the same theory that he unsuccessfully advocated in his four motions, for: judgment on the pleadings, directed verdict, judgment notwithstanding the verdict, and new trial. As he explains it, the facts alleged by Rinske—namely, that he drugged her with Ambien and had nonconsensual sex with her—describe a claim for sexual battery pursuant to

6

section 1708.5.[5] Even if true, which he denies, they would not constitute domestic violence because Rinske neither alleged nor demonstrated at trial that she suffered bodily injury or apprehension of imminent serious bodily injury, an element section 1708.6 unambiguously requires. He submits the issue is one of statutory interpretation and that claims under sections 1708.5 and 1708.6 are mutually exclusive, with section 1708.5 a specific statute that governs over section 1708.6. According to Rick, "spousal rape is simply not the equivalent of 'bodily injury.' " And, he submits, Rinske should not have been permitted to resurrect her time-barred and dismissed claims of rape and sexual battery under the guise of domestic violence. We are not persuaded.

To begin with, the legislative history of section 1708.6 belies Rick's assertion that the two statutes are mutually exclusive. In its analysis of Assembly Bill 1933 (2001-2002 Reg. Sess.), which was ultimately codified as section 1708.6, the Assembly Committee on Judiciary observed that Assembly Bill 1933 and Assembly Bill 1928 (2001-2002 Reg. Sess.), which would become section 1708.5, "overlap somewhat as to the acts that would be actionable under each . . . ." Similarly, the Assembly Republican Bill Analysis of Assembly Bill 1933 noted that the two statutes "would both overlap with

---

[5] Under section 1708.5, subdivision (a), a person who does any of the following commits a sexual battery: "(1) Acts with the intent to cause a harmful or offensive contact with an intimate part of another, and a sexually offensive contact with that person directly or indirectly results. [¶] (2) Acts with the intent to cause a harmful or offensive contact with another by use of his or her intimate part, and a sexually offensive contact with that person directly or indirectly results. [¶] (3) Acts to cause an imminent apprehension of the conduct described in paragraph (1) or (2), and a sexually offensive contact with that person directly or indirectly results."

Section 1708.6 provides in pertinent part: "A person is liable for the tort of domestic violence if the plaintiff proves both of the following elements: [¶] (1) The infliction of injury upon the plaintiff resulting from abuse, as defined in subdivision (a) of Section 13700 of the Penal Code. [¶] (2) The abuse was committed by the defendant, a person having a relationship with the plaintiff . . . ."

Penal Code section 13700, subdivision (a) defines "abuse" as "intentionally or recklessly causing or attempting to cause bodily injury, or placing another person in reasonable apprehension of imminent serious bodily injury to himself or herself, or another."

7

existing law and each other . . . ." And the statutory provisions themselves both state that "The rights and remedies provided in this section are in addition to any other rights and remedies provided by law." (§ 1708.5, subd. (e); § 1708.6, subd. (d).)

Moreover, Rick fails to cite any authority supporting this position. And existing authority is to the contrary.

In *Pugliese v. Superior Court* (2007) 146 Cal.App.4th 1444, the wife had been subjected to numerous acts of abuse by her husband. Like here, the wife's claims for assault and battery were time-barred, so the court considered whether she could assert the same claims as a domestic violence cause of action under section 1708.6. In holding that she could, it stated:

"The time for commencement of an action under Civil Code section 1708.6 is governed by Code of Civil Procedure section 340.15, which provides: '(a) In any civil action for recovery of damages suffered as a result of domestic violence, the time for commencement of the action shall be the later of the following:

" 'Within three years from the date of the last act of domestic violence by the defendant against the plaintiff.

" '(2) Within three years from the date the plaintiff discovers or reasonably should have discovered that an injury or illness resulted from an act of domestic violence by the defendant against the plaintiff.

" '(B) As used in this section, "domestic violence" has the same meaning as defined in Section 6211 of the Family Code."

"Family Code section 6211 defines 'domestic violence' as 'abuse perpetrated against . . . [a] spouse or former spouse.' (Fam. Code, § 6211, subd. (a).)

" 'Abuse' is defined as any of the following: '(a) Intentionally or recklessly to cause or attempt to cause bodily injury. [¶] (b) Sexual assault. [¶] (c) To place a person in reasonable apprehension of imminent serious bodily injury to that person or to another. [¶] (d) To engage in any behavior that has been or could be enjoined pursuant to Section 6320.' (Fam. Code, § 6203.)" (*Pugliese v. Superior Court, supra,* 146 Cal.App.4th at pp. 1448-1449, fn. omitted.)

8

Following that exposition of the law, the Court of Appeal concluded as follows: "Although the assault and battery causes of action are barred by the applicable statute of limitations, the complaint, taken as a whole, alleges a violation of Civil Code section 1708.6. Michele claims that during the period June 1989 to April 2004, Dante shoved, pushed, kicked, hit, slapped, shook, choked and sexually abused her. She also alleges he pulled her hair, pinched and twisted her flesh, threatened to kill her, threatened her with bodily harm, confined her in the family car while driving erratically and drunkenly and infected her with sexually transmitted diseases. Clearly, Michele has alleged that Dante intentionally or recklessly caused or attempted to cause her bodily injury, sexually assaulted her, placed her in reasonable apprehension of imminent serious bodily injury and engaged in behavior that could have been enjoined pursuant to Family Code section 6320. We therefore conclude Michele has set forth a cognizable claim for domestic violence." (*Pugliese v. Superior Court, supra,* 146 Cal.App.4th at p. 1450.)

Likewise here: domestic violence expressly includes sexual assault, and Rinske's claim was thus properly before the jury.

## B. Rick's Factual Recitation Is Inadequate For a Substantial Evidence Challenge

In a separate argument, Rick asserts a substantial evidence challenge to the jury's verdict (although he fails to identify the substantial evidence test as the applicable standard of review). He contends that Rinske "failed to show the requisite elements of a domestic violence claim," because "there was absolutely no evidence that Defendant intentionally or recklessly attempted to put his ex-wife in danger of bodily injury." Significantly for our purposes, an appellant challenging the sufficiency of the evidence to support a judgment is required to state in the opening brief all evidence pertinent to that point. If this is not done, the reviewing court may treat the issue as forfeited. (*In re Marriage of Fink* (1979) 25 Cal.3d 877, 887; *Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881; *Arechiga v. Dolores Press, Inc.* (2011) 192 Cal.App.4th 567, 571-572; *In re Marriage of Steiner* (2004) 117 Cal.App.4th 519, 530; *Estate of Hilton* (1996) 44 Cal.App.4th 890, 922; Cal. Rules of Court, rule 8.204(a)(2)(C) [appellant's opening

9

brief must "[p]rovide a summary of the significant facts limited to matters in the record"]; Eisenberg et al., Cal. Practice Guide: Civil Appeals & Writs (The Rutter Group 2012) §§ 8:70-8:71, p. 8-36.) Rick was thus required to set forth all material evidence in his opening brief. This, he failed to do.

Despite that the presentation of evidence at trial consumed seven days and resulted in a reporter's transcript of over 1,300 pages, Rick's factual statement in his opening brief consists *in its entirety* of the following two paragraphs: "On or about March 3, 2010, Rinske Bolander filed her suit for her original four claims. [Citation.] As noted above, three of those claims: 1) spousal rape, 2) sexual buttery [*sic*], and [3)] intentional infliction of emotional distress were voluntarily dismissed prior to trial leaving the one and only remaining claim—domestic violence, pursuant to Cal. Civil Code Section 1708.6. [Citation.] [¶] With the remaining claim, Plaintiff alleged four instances of domestic violence, surrounding allegations that on two occasions, March 7, 2007 and April 22, 2007, Defendant mixed the drug Ambien into a glass of wine that he served to his wife, and subsequently engaged in sexual activity with her. Plaintiff's theory was that each instance of Defendant serving the wine mixed with Ambien was an instance of domestic violence; and each subsequent sexual encounter was also an instance of domestic violence, as defined by Section 1708.6. [Citation.] No other allegation of any other incident of domestic violence was before the Court."

The deficiencies of Rick's iteration of the facts are obvious, and we easily conclude he forfeited his substantial evidence challenge.

In attempting to persuade us otherwise, Rick claims that his abbreviated recitation of facts was adequate because "the fundamental facts are not in dispute." This assertion is belied by the fact that the parties disputed whether the sexual intercourse was consensual and whether Rinske suffered bodily injury as a result of it. Moreover, in challenging a verdict as unsupported by substantial evidence, Rick was obligated to set forth all *material* facts, not just *disputed* facts.

Rick also submits that the fact that his opening brief contained an adequate rendition of the facts was "evidenced by the fact that [Rinske's] Respondent's Brief adds

10

no new facts that are material to the tort of domestic violence." He claims that in her own statement of facts, Rinske spent only one paragraph describing her injuries. This completely disregards the three pages of facts detailing what she experienced after she consumed the Ambien-laced wine, testimony that specifically related to the bodily injury and apprehension of imminent serious bodily injury that she suffered.

Lastly, Rick submits that the law did not require him to set forth all material evidence in a particular section, suggesting that all material facts are contained elsewhere in his opening brief. It is true that peppered throughout Rick's opening brief are references to other evidence offered at trial, some to Rinske's testimony and others to that of her professional witnesses. Not only do many of these references lack citation to the reporter's transcript,[6] but these occasional references are few—and certainly do not provide a whole and complete summary of the evidence pertinent to Rinske's domestic violence claim. In short, Rick's briefing manifests total disregard for settled principles of appellate procedure. Such conduct is not to be condoned.

### C. Substantial Evidence Supported the Jury's Verdict

But even if we were to give Rick the benefit of the doubt and agree that he set forth an adequate recitation of material facts—which we do not—his argument would nevertheless fail because substantial evidence supported the jury's verdict.

As noted above, a claim for domestic violence under section 1708.6 consists of the infliction of injury on the victim resulting from abuse by a person having a relationship with the victim. Section 1708.6 incorporates Penal Code section 13700's definition of "abuse," which is "intentionally or recklessly causing or attempting to cause bodily

---

[6] For example, in arguing that Rinske did not present evidence of bodily harm, Rick states, "Plaintiff testified that she was allegedly traumatized as a result of the alleged events of March 7 and April 22, 2007. Her therapist testified that the Plaintiff continued to suffer emotionally from the alleged rape by Defendant that she claims she endured. [Citation.] Plaintiff's psychiatrist testified that Rinske Bolander suffered from post traumatic stress syndrome caused by the betrayal and violation perpetuated by the Defendant." This paragraph is unsupported by any citation to the reporter's transcript. The only citation is to a page in the clerk's transcript, which page is a page from Rinske's opposition to Rick's motion for judgment notwithstanding the verdict.

11

injury, or placing another person in reasonable apprehension of imminent serious bodily injury to himself or herself, or another." Here, Rinske presented ample evidence to support a conclusion that by incapacitating her with Ambien and then having sexual intercourse with her without her consent, Rick intentionally or recklessly inflicted bodily injury upon her or placed her in reasonable apprehension of imminent serious bodily injury.

As previously detailed, Rinske testified that after the first time Rick drugged her, she did not feel well. She was nauseous, light-headed, and dizzy. She could not speak or move and she felt like she was under water, which she described as "terrifying." Her vision was impaired in that she could see directly in front of her but everything else was "faded out." She did not want to have sex with Rick but she was "frozen" and could not stop him. She described it as "petrifying" because she did not know what was happening to her body. The following morning, she lost her balance and fell down in the shower because she "felt very disoriented like the room was spinning . . . ."

During the April 22 incident, Rinske described similar physical feelings, but also detailed the sexual intercourse. According to Rinske's testimony, Rick forced her to perform oral sex on him, causing her to gag from his forceful thrusting. He then had intercourse with her from the front and back, at one point forcing her head down onto the ottoman and pulling her hair back tightly.

In addition to her own testimony, Rinske introduced testimony by her professional witnesses who testified that as a result of the Ambien incidents, Rinske suffered from PTSD.

Despite this evidence, Rick still insists that "There is no evidence that Rinske Bolander was the victim of violence or that she suffered physical injury. There was no evidence that she was placed in reasonable apprehension of imminent serious bodily injury." In light of the foregoing, we easily conclude to the contrary.

12

**D. Rick Forfeited His Argument That He Was Prejudiced by Excessive Testimony About Rape**

In a third argument, Rick contends that he was prejudiced by improper references to the word "rape" at trial. Once again, he notes that prior to trial Rinske dismissed her spousal rape, sexual battery, and intentional infliction of emotional distress claims. Despite this, she repeatedly offered testimony—either her own or that of her professional witnesses—that he had nonconsensual sex with her, testimony that often referred to the encounters as "rape." This was done, Rick claims, to prejudice the jury against him, despite the fact that any testimony regarding nonconsensual sex was, according to him, irrelevant to Rinske's domestic violence claim and despite the court's pretrial ruling that references to "rape" would not be permitted.

Rick cites multiple examples of the purportedly objectionable testimony. For one, he quotes the following question posed to Rinske by her counsel: "You've never in your past had any situation where, before March 7th, with the defendant or anybody else, where you felt there was a date rape or you were drugged or that you were sexually assaulted or that you had nonconsensual sex; you have no history of that, correct."

Additionally, in a section of his opening brief entitled, "The Court allowed the Plaintiff's counsel to elicit comments from Rinske Bolander alleging she was raped," Rick quotes a passage from Rinske's deposition testimony that he claims her counsel read to the jury, as follows:

"Question: Is this the testimony you gave on that subject at your deposition, same date-yes. I'm sorry. This is Thursday, July 22nd, 2010, at page 458—at page 23:

" 'Question: Okay. I mean—when you read it, did you think to yourself that "This guy really loves me"?'

" 'Answer: I honestly think that he did love me. And why? Why would he choose to do what he did? I mean, what husband does that? If you feel this way, why would you drug me and rape me repeatedly? Why would you do that?'

" 'Question: When you read it, you felt the comments, the sentiments that he was expressing in this letter were sincere. You felt that he really meant it?'

13

" 'Answer: In—yes, I do feel that he meant it. But I also, you know—they're words. And actions and words obviously I had been violated and humiliated and totally betrayed by this person who wrote this, so it doesn't make sense to me.'

"Was that honest testimony that you gave me?

"Answer: Yes."

Rick also complains that Rinske's professional witnesses were encouraged to offer testimony that Rick raped Rinske. For example, he quotes testimony by Jan DiSanto, the couple's marital counselor who testified on Rinske's behalf, in which she stated that it "was a horrible betrayal [for Rinske] to then be drugged and raped by" Rick. He cites Rinske's cross-examination of Dr. Diane Everstine, who offered testimony about the development of posttraumatic stress disorder in victims of nonconsensual sex. And he cites Rinske's cross-examination of Dr. John Barry concerning the effects of Ambien and wine on a person. This evidence, Rick claims, all ran counter to the trial court's admonition that the attorneys not raise the rape allegations because they were not relevant to the elements of Rinske's section 1708.6 claim. Rick's argument fails for four reasons.

First, significantly missing from any of the referenced testimony is a timely objection by Rick's counsel. It is well-established "that in order to raise the point of erroneously admitted evidence on appeal, there must be a showing that a timely objection had been made at trial directing the attention of the trial court to the particular evidence sought to be excluded." (*Dugar v. Happy Tiger Records, Inc.* (1974) 41 Cal.App.3d 811, 817; accord, *Stenseth v. Wells Fargo Bank* (1995) 41 Cal.App.4th 457, 462 ["[I]n order to raise the issue of the admissibility of evidence, a party must make a timely objection on a specific ground."]; *People v. Smith* (1986) 180 Cal.App.3d 72, 79 ["An appellate court is precluded from reviewing questions concerning the admissibility of evidence for the first time on appeal."].) This rule finds support in Evidence Code section 353, which provides, in pertinent part: "A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless: [¶] (a) There appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific

ground of the objection or motion. . . ." Here, Rick identifies no timely objection or motion to strike, nor did our review of the record reveal any. He thus failed to preserve this claim for appellate review.

In reply, Rick suggests that the trial court exempted his counsel from the universal obligation of objecting to improper evidence at the time it is offered. As he explains it, at a pretrial conference on motions in limine, Rick's counsel objected to witnesses using the word "rape." According to Rick, "the Court explicitly stated that there would be, in essence, an ongoing objection to any inflammatory language. It was further stated that an objection to each instance would not be required." Rick's interpretation of the actual exchange is fanciful at best.

At a pretrial conference on June 30, 2011, the court ruled on the written motions in limine, after which counsel for Rick advised that he had two additional motions. In the first, he sought "to preclude plaintiffs' counsel in questioning a witness in argument and opening statement to describe the conduct that is now at issue as a rape," complaining "that would be terribly unfair because they've dismissed the rape cause of action." The following colloquy ensued:

"THE COURT: I think rape calls for a legal conclusion. Sustained. I wouldn't allow that.

"MR. SMITH [RICK'S COUNSEL]: Right. Now, I understand, your Honor, just in that regard, that there'll be testimony from witnesses that we've learned that the word was used. And, of course, that's legitimate, fair game. But counsel may not—and I think you've already ruled and I understand that. But if a witness is talking about a prior statement in which the words were used, I mean, that's fine. They can talk about it as long as it wasn't some opinion of theirs or conclusion of theirs, but thank you for the ruling in that regard. [¶] . . . [¶]

"Yes. And these comments—included in that, these comments about using a penis as a weapon, which is an acronym for rape. Not an acronym, I mean a—it's basically the same thing. None of that hysterical kind of commentary should occur in this trial pursuant to the Court's ruling.

15

"THE COURT: Well, there's always argument as you know, Mr. Smith, and we get to sometimes argue our cases and words are used to define instruments of violence. And I'm not going to preclude people in that regard, but certainly when we do our opening statements and talk about what the evidence will show and when we interrogate witnesses. . . and we question witnesses, legal terms, they call for legal conclusions and would not be appropriate. Questions like rape—[¶] . . . [¶] obviously are legal conclusions and not factual issues. So I understand that."

The issue was again touched upon the following day when the court considered Rick's motion to preclude Rinske's counsel from referring to Ambien as a "date rape like drug." This exchange ensued:

"THE COURT: I've been doing criminal law for over 20 years, I've never heard of anyone dropping an Ambien in someone's cocktail as a date rape drug. There are other drugs, but I'm surprised at that one. I mean, we'll see what the experts have to say, but you know, again, words are important. You can explain what someone does. We don't have legal conclusions nor do we have, you know, words that are particularly inflammatory. You know? I think that's just how we conduct business.

"We don't call a murderer a murderer until he's convicted of a murder. We don't call a rapist a rapist until he is convicted of a rape. That's how we proceed.

"Date rape-like drug sort of creates connotations that have no business in a court of law. It is what it is. And, thus, it is Ambien and if it is allegedly dropped into someone's drink and then what happens thereafter is what we're talking about here, we don't need to create monikers to somehow inflame a jury. That's the only purpose for this. So the motion is granted.

"MR. EMANUEL [RINSKE'S COUNSEL]: I think the Court made its ruling yesterday that counsel is not to use the word 'rape.' I have no intention of doing so, but I can, again, advise the Court that the experts on both sides have cited literature and have used this language because Ambien, like Rohypnol, which is often referred to as 'roofies,' is basically in the same classification of controlled substance. So I think we're

16

just in a situation where a clinical phrase might be different than a legal one. I know not to use the term.

"THE COURT: And the question is was it done? And was it done without consent? And what are the damages? I mean, those are the simple aspects of the case. So, you know, I admonish both sides from—and I will sui sponte preclude you from going into undue inflammatory remarks. I won't need an objection and that goes for both sides. If both sides in any way get out of control during the trial that I view of being over the top, so to speak, you know, approaching witnesses without permission, you know, becoming a little too caustic with witnesses, you will be admonished. And these are the kinds of issues as to that. So that's granted. I see that as quite appropriate."

Neither of the foregoing exchanges can reasonably be construed as granting Rick's counsel a wholesale exemption from the obligation to timely object to evidence that he considered improper. This conclusion is underscored by the court's minutes of the June 30 hearing: "Defense counsel moves the Court for an order precluding Plaintiff's counsel from questioning witnesses about a 'rape'. The Court states that the term 'rape' would be precluded and *the Court would sustain the Defendant's objection if that term is used*." (Italics added.) And, in fact, the court even admonished Rick's counsel during trial that certain evidence came in because counsel did not object to it: "The problem I have is I can't sustain my own objections on a regular basis. You allowed this. You didn't object to it, and perhaps you should have . . . ." Counsel was unquestionably on notice of his obligation to object at the time Rinske's counsel introduced what he considered to be improper evidence.

In further disputing that he forfeited this argument by failing to timely object, Rick also argues that forfeiture does not result when the improper admission of evidence results in a miscarriage of justice such that the judgment should be set aside. Rick's cited authority does not support a conclusion that a miscarriage of justice occurred here.

Second, Rick's argument that the jury improperly heard testimony about rape fails because his counsel acknowledged that, in certain contexts, such testimony was

17

"legitimate, fair game." Despite this concession, Rick makes no effort here to advise when such testimony was improper and when it was "legitimate, fair game."

Third, Rick has waived this argument by introducing evidence concerning rape himself. As noted above, Rick complains that Rinske's counsel read a passage of her deposition testimony in which Rinske wondered why Rick would drug and rape her if he loved her. Quite shockingly, while Rick accuses Rinske's counsel of improperly putting this evidence before the jury, this testimony was in fact introduced by *Rick's own counsel* during his cross-examination of Rinske. We hope this false accusation resulted from an innocent error by Rick's appellate counsel, rather than a deliberate attempt to mislead this Court.[7] But, regardless, the fact remains that Rick's counsel put this evidence before the jury. He cannot now be heard to complain about it.

Lastly, we note that an appellant arguing on appeal that the jury heard improper evidence must not only show that the evidence should not have been admitted, but also that he or she was prejudiced by the evidence. Rick does not do so.

### E. Rick Forfeited His Argument That the Trial Court Erred In Failing to Give a Limiting Instruction Regarding Rape Testimony

In a corollary to the above argument, Rick complains that once the improper testimony concerning rape came in, the trial court should have instructed the jury that such testimony "could not properly be considered, as [it did] not relate to any statutory element" of a domestic violence claim. He claims that such testimony, which only related to claims that had been dismissed, "obfuscated matters" and likely misled the jury. As held above, Rick forfeited any claimed evidentiary error by failing to object to the testimony. He cannot now circumvent that error by framing it as an instructional error. More significantly, Rick's argument ignores the elephant in the room: he never requested such an instruction.

It is well established that " ' " 'In a civil case, each of the parties must propose complete and comprehensive instructions in accordance with his [or her] theory of the

---

[7] We note that Rick's reply brief is devoid of any acknowledgment of this wrongful accusation.

litigation; if the parties do not do so, the court has no duty to instruct on its own motion.' " ' " (*Metcalf v. County of San Joaquin* (2008) 42 Cal.4th 1121, 1130-1131; *Transport Ins. Co. v. TIG Ins. Co.* (2012) 202 Cal.App.4th 984, 1008; *Null v. City of Los Angeles* (1988) 206 Cal.App.3d 1528, 1534-1535; Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs, *supra,* §§ 8:266, p. 8-170.)

Rick seeks to avoid application of this rule by suggesting that the court had an affirmative duty to properly instruct the jury even in the absence of a specific request. This principle, however, applies only in criminal cases, as illustrated by the fact that Rick relies on criminal cases to support his argument. (See, e.g., *People v. Martin* (2000) 78 Cal.App.4th 1107, 1111; *People v. Gerber* (2011) 196 Cal.App.4th 368, 390.)

In his rely brief, faced with Rinske's response pointing out that he was advocating a rule applicable only in criminal cases, Rick seeks support from our recent opinion in *Veronese v. Lucasfilm, Ltd.* (2012) 212 Cal.App.4th 1 (*Veronese*), claiming it "addressed the question of whether the failure of a party to request a particular jury instruction necessarily waives the ability to raise that issue on appeal." According to Rick, we held that "While such failure normally would create a barrier in the appellate court, there is an exception when the trial court fails to properly instruct on the material issues and legal principles necessary for the jurors to understand and therefore follow the applicable law." While there may exist such an exception, it does not apply here.

In *Veronese, supra,* 212 Cal.App.4th at p. 28, we considered, as pertinent here, the court's failure to instruct the jury on plaintiff's claim for failure to prevent discrimination, a claim on which the jury returned a verdict for plaintiff despite the lack of an instruction on that cause of action. Apropos to this issue, we stated: "The trial court must instruct on the law applicable to the facts developed by the evidence and every reasonable theory that the evidence supports. [Citations.] As the Supreme Court has recognized, 'there ordinarily is no duty to instruct in the absence of a specific request by a party; the exception is a complete failure to instruct on material issues and controlling legal principles which may amount to reversible error. [Citations.]' [Citation.].) [¶] Witkin distills the rule this way: '[I]t is the duty of the court to see that jurors are guided on

19

controlling legal principles, and the complete failure to instruct properly on a basic issue may be reversible error. [Citations.].' (7 Witkin, Cal. Procedure (5th ed. 2008) Trial, § 261, pp. 315–316.)." We then concluded that under the facts of that case, the absence of an instruction on failure to prevent discrimination was indeed error. (*Veronese, supra,* 212 Cal.App.4th at pp. 28-29.) This case, however, is different.

First, and most significantly, in *Veronese*, the court was prepared to give the instruction at issue but was advised—erroneously—that it had already read it. (*Veronese, supra,* 212 Cal.App.4th at p. 28.) Here, Rick never requested an instruction regarding the rape testimony. Moreover, the instruction omitted in *Veronese* went to the very elements of the cause of action. Here, as Rick concedes, the jury was properly instructed on the elements of a domestic violence claim. We thus cannot see how this case falls within an exception where there "is a complete failure to instruct on material issues and controlling legal principles . . . ." (*Ibid.*)

But, once again, even if we were to overlook Rick's forfeiture of this argument and were to agree with him that there had in fact been error, we would still reject his argument. This is so because reversal for instructional error is only warranted where the error resulted in a miscarriage of justice. (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 580 (*Soule*).) In other words, to merit reversal Rick would have to demonstrate that, absent the alleged error, it is "reasonably probable" that the jury would have reached a different result. (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 800.) This showing requires an analysis of several factors, which the court in *Soule* identified as including the state of the evidence, the effect of other instructions, the effect of counsel's arguments, and any indication by the jury itself that it was misled. (*Soule, supra,* 8 Cal.4th at pp. 580-581.)

While repeatedly asserting that he suffered "prejudice"—indeed, "extreme prejudice"—Rick makes no effort in his opening brief to actually *demonstrate* how he was prejudiced, to address the factors outlined in *Soule*. By failing to present this argument in his opening brief, it, too, has been forfeited.

20

Lastly, we note that Rick does not even suggest how the jury should have been instructed.  Since he never requested a limiting instruction, he asks us to rule on this issue in a vacuum.  We decline to do so.

### F.  Rick Forfeited His Argument That the Trial Court Erred In Allowing Testimony Regarding the PTSD Rinske Suffered

Rick also suggests that evidence regarding posttraumatic stress disorder was irrelevant to Rinske's domestic violence claim because PTSD does not constitute bodily injury, and he complains that the trial court "did nothing to stop" Rinske from offering testimony regarding the disorder.  He further complains that the trial court failed to "clarify with the jury" that "allegations of PTSD cannot satisfy the bodily injury required under Section 1708.6."  Again—and without deciding whether the evidence was properly admitted—Rick neither objected to the testimony nor requested a limiting instruction, so he cannot now be heard to complain.

In sum, we reject all of Rick's arguments and affirm the judgment.  We thus turn to the issues presented by Rinske's appeal, which arose following posttrial motions.

### DISCUSSION—RINSKE'S APPEAL

### A.  Rinske's Memorandum of Costs

On August 19, 2011, Rinske filed a memorandum of costs seeking $155,622.  The costs were itemized as follows:  $555 for filing and motion fees; $5,941 for jury fees; $23,962 for depositions; $454 for service of process; $55 for attachment expenses; $86,297 for expert witness fees; $155 for blowups of trial exhibits; $2,000 for court reporter fees; and $36,203 for "other."

Attachments 13 and 13A detailed the expenses comprising the "other" category. They included $1,574.72 for "records obtained through subpoena & authorizations"; $3,763.53 for copies of videotaped depositions; $340 for family law court transcripts; $36.93 for two books by defense expert Diana Everstine, M.D. purchased from Amazon.com; $955.29 for mail and messenger deliveries; $3,025.50 for Gregg Oglesby Investigations, Private Investigation Services; $1,441.40 for travel expenses for witness Eileen Blocki; $24,790.85 for National Jury Project/West; and $275 for a jury verdict

21

search.  Aside from the expenditures for records obtained through subpoenas, copies, and mail and messenger deliveries, Rinske sought these "other" costs pursuant to section 1708.6.

On September 1, 2011, Rick filed a motion to tax costs.  Arguing that the vast majority of the costs Rinske sought to recover were not reimbursable, Rick requested that the court tax $142,307 of the $155,622 she was seeking, specifically challenging five categories of costs.

As to deposition expenses, Rick argued that $17,280—Rinske's expenditure for Rick's and her depositions—should be reduced by 75 percent.[8]  He reasoned that because Rinske dismissed three of her four causes of action, only prevailing on her domestic violence claim, she should only recover 25 percent of the deposition costs, or $4,320.

Rick argued that all of the $86,297 requested for expert witness fees should be disallowed.  He noted that Code of Civil Procedure section 1033.5 provides for the recovery of expert witness fees only when the expert was "ordered by the court" or when the fees are expressly provided for by law.  None of Rinske's experts was court ordered.  Section 1708.6 authorizes "general damages, special damages, and punitive damages," as well as "equitable relief, an injunction, costs, and any other relief that the court deems proper, including reasonable attorney's fees."  It does not, Rick noted, provide for expert witness fees.

Of the $454 Rinske sought for service of process, Rick sought a reduction of $174, the amount Rinske incurred to serve three witnesses who were neither deposed nor called as witnesses at trial.  Rick also argued that Rinske's request for $2,000 for court reporter fees should be disallowed because there was no showing that the trial court reporter was necessary to the litigation.

---

[8] While Rinske requested $23,962 for depositions, Rick sought to tax only $17,280 of that.  Apparently, he did not dispute the costs she incurred for the depositions of Glenn Perkins, Charlene Perkins, Lana Norris, Jan DiSanto, Sheila Krystal, Judith Stewart, Beverly Joyce, John Barry, Peter Davie, James Missett, Diana Everstine, David Spiegel, M.D., and David Young, M.D., which costs totaled $6,682.

22

Lastly, Rick sought to tax Rinske's claim for "other" expenses, seeking a reduction of $29,257.75 of the $36,203 requested. He argued that most of the expenses were not authorized as recoverable expenses and many were, in fact, expressly disallowed by Code of Civil Procedure section 1033.5, subdivision (b). The largest portion of this category was jury consultant fees paid to National Jury Project/West and investigative expenses paid to Gregg Oglesby Investigations ($24,790.85 and $3,025.50, respectively), both of which Code of Civil Procedure section 1033.5, subdivision (b)(2), exclude except when expressly authorized by law. Rick also argued that $340 for family law court transcripts should be taxed because they were not court ordered, and that $275 for a jury verdict search and $1,441.40 for Eileen Blocki's travel expenses were also noncompensable.

On September 19, 2011, Rinske filed opposition to Rick's motion to tax costs. She disputed Rick's claims that certain of her requested costs were unauthorized, contending that costs not specifically provided for under Code of Civil Procedure section 1033.5 were authorized by section 1708.6, subdivision (c), which allows for "any other relief that the court deems proper." She also disputed that the costs should be apportioned, arguing that the facts supporting the successful domestic violence claim were the same as those supporting the dismissed causes of action.

Rinske then sought to justify each requested expenditure. She claimed the fees for service of process were necessarily incurred because the witnesses were evading service, and the court reporter fees should be allowed because Rinske was obligated to pay the court reporter at trial.

As to the expert witness fees, Rinske argued that section 1708.6 authorized the court to award any other relief that it deemed proper. Rinske was required to retain experts to refute the evidence presented by Rick's experts, and reimbursement for those fees was necessary to make her whole, as contemplated by the statute. And concerning the experts who did not testify, they nevertheless provided expert advice.

Concerning item 13—additional expenses—Rinske argued the necessity of each expense: the jury consultant was "critical to the case," the investigator was necessary to

23

interview witnesses who may have had relevant information about Rick, and Eileen Blockee was an out-of-state witness who may not have been able to testify had her airfare not been covered.

### B. Rinske's Motion for Attorney's Fees

Meanwhile, on September 8, 2011, Rinske filed a "Motion for Attorney's Fees and Costs Not Recoverable under CCP §1033.5." The motion was based on section 1708.6, subdivision (c), which provides as follows: "The court, in an action pursuant to this section, may grant to a prevailing plaintiff equitable relief, an injunction, costs, and any other relief that the court deems proper, including reasonable attorney's fees."

Rinske requested an award of "reasonable attorney fees of $455,600 plus an enhancement multiplier of 1.5 for attorney time," as well as an additional $10,000 for the preparation of the fee motion. According to Rinske, under discretionary fee shifting statutes such as section 1708, subdivision (c), "the prevailing plaintiffs in public interest litigation are ordinarily entitled to reasonable attorneys fees, and fees may be denied only when 'special circumstances would render an award unjust.' " She argued that this standard should be applied here, because she "pursued her claim under Civil Code section 1708.6 to vindicate a very important statutory right to be seek [*sic*] redress from the injuries suffered at the hands of her former husband in violation of the state's domestic violence laws." Further, Rinske submitted that awarding her attorney's fees would serve the legislative purposes of section 1708.6 which, according to the statute itself, are "to enhance the civil remedies available to victims of domestic violence in order to underscore society's condemnation of these acts, to ensure complete recovery to the victims, and to impose significant financial consequences upon perpetrators."

Rinske's motion also argued that she was entitled to her costs for experts and investigation. Conceding that Code of Civil Procedure section 1033.5, subdivision (b)(1) expressly excludes recovery of " '[f]ees of experts not ordered by the court' '*except when expressly authorized by law*,' " Rinske submitted section 1708.6 authorized them for successful domestic violence plaintiffs because, as noted, it was designed to enhance the remedies available to victims of domestic violence and to ensure their complete recovery.

24

On September 19, 2011, Rick filed opposition to Rinske's fee motion. He denied that the litigation involved the enforcement of an important right or that it conferred a significant benefit on the general public or a large class of individuals. Alternatively, Rick argued that there were special circumstances rendering a fee award unjust. Specifically, he described Rinske's conduct in the litigation as "outrageous." Her complaint, he said, accused him of 15 years of abuse, charges he had to defend himself against, only to have her dismiss three of her claims on the eve of trial, leaving only a single cause of action for domestic violence stemming from the two, as he put it, "Ambien incidents." Further, he claimed he repeatedly attempted to settle both Rinske's civil case and their marital dissolution action, but Rinske refused, adhering to manifestly unreasonable settlement demands far exceeding what she was ultimately awarded by the jury.

If the court was inclined to award fees, however, Rick urged the court to apportion them. He reasoned that Rinske's attorneys invoiced all the time they spent litigating the case, while Rinske only prevailed on one of her four claims. Rinske's motion failed to make any attempt to apportion the fees which, Rick contended, justified denial of her request in its entirety. At most, she should be awarded 25 percent of the requested fees.

Rick also submitted that Rinske's lodestar calculation was unreasonable. She requested hourly rates of $400 and $500 for the two attorneys who represented her, which Rick argued should be reduced to $100 and $250 per hour, the rates his attorneys charged him. Further, Rinske was not entitled to an enhancement because none of the factors warranting a multiplier existed.

Lastly, Rick disputed Rinske's entitlement to expert fees. He noted that she relied on a case involving the award of expert fees under section 1794, which provides for the recovery of "costs and expenses." Section 1708.6 only provides for the recovery of "costs." Additionally, the amount of her request was unreasonable, since it sought fees for experts who never testified.

On September 23, 2011, Rinske filed a reply in support of her fee motion. In short, she argued that Rick failed to demonstrate the existence of special circumstances

25

justifying denial of her fee request; there was no basis for apportioning fees; and her lodestar calculation and enhancement request were reasonable.

### C. Hearing on Rinske's Fee Motion and Rick's Motions to Tax Costs

On September 30, 2011, Rinske's motion for attorney's fees and Rick's motions to tax costs came on for hearing, as did Rick's motion for new trial.[9] Rick's counsel argued first and began by arguing—yet again—that Rinske's "put one over on the jury," convincing them to find for her on her domestic violence claim when she had really alleged sexual battery. In light of that, Rick urged the court to "have the courage to say no" and grant his motion for a new trial.

Turning to the fee motion, Rick's counsel disputed Rinske's version of settlement discussions that portrayed her as making reasonable settlement demands while he responded with only unreasonable offers. In fact, according to Rick's counsel, Rinske demanded nine million dollars, ultimately receiving less than five percent of that from the jury. And, counsel argued, Rick had offered her $151,000 plus her attorney's fees, which was equivalent to what Rinske claimed she would have settled for.

After Rick's counsel made a few additional arguments directed exclusively at the motion for new trial, argument shifted to Rinske's counsel. He began by disputing Rick's version of the settlement negotiations, contending that Rick's offer of $151,000 was nothing more than a nuisance value offer, especially considering the horrific events to which he subjected Rinske.

The court interrupted Rinske's counsel to say this: "You make these arguments and we're heard these before, and as I said numerous times, someone failed to pursue the case within the statute of limitations to make this a sexual battery or other crime under the Civil Code, but instead waited until that time had passed to file the charges or the allegations and took this case and argued it was a domestic violence case, which was, as I said before, a close call under the law . . . . [¶] . . . [¶] One of the problems that continues

---

[9] Rick's motion for new trial also contained a request for remittitur. It is irrelevant to the issues before it, and we thus omit discussion of it.

on this case that bothers me is the reality that, you know, you could be standing before me with four causes of action and make your arguments like a shining knight saying this was what was done and this is what needs to be taken care of; however, you're not. Three causes of action went down at your own motion to dismiss and you were left basically arguing a domestic violence case with facts such as these, which puts you in a much more difficult position. You wouldn't have had such a difficult position had the case been filed just weeks before. [¶] And so with that said, the righteous indignation may well be there for you to argue in terms of people to hear, but in terms of the law and the requirements under the law, we tried this as a domestic violence case and that was a difficult process I thought. Candidly a case that was a close call when [Rick] brought his motion for a directed verdict."

Rinske's counsel briefly disputed the court's characterization of the case, and the court continued: "What I'm saying is the law and you tried this as a domestic violence case, not a sexual battery case. And regardless of what the facts are, it must fly within the context of the cause of action that is viable. And there was only one viable cause of action. And that's not because of—well, that's because of not pursuing the case prior to the statute of limitations. And so when one sits on their hands, so to speak, and not proceed, that leads [*sic*] you with fewer causes of action. The facts don't change, but the remedies do. And that's one of the issues that I grapple with in this case. [¶] I'm not saying that I'm in any way siding with one side or another or feel that these facts are not egregious or any of that, what I'm saying is because of someone not pursuing this when this was a viable case, you're down to a domestic violence case. And this is what I said from the beginning, you're down to a domestic violence case that we can, you know, raise the flag and use the language of . . . rape and words such as that, but the problem was, for you, was this was a domestic violence case, it wasn't a sexual battery case. It was the emotional infliction of distress, I mean, infliction of emotional distress. It was one cause out of four that finally made it to the jury. And the jury did reach a verdict and they reach a rather high verdict as I've already indicated, but that being said, now you

27

need to address the issues . . . why I should grant attorney's fees and why I shouldn't grant the motion to tax costs?"

After Rinske's counsel briefly responded, the court turned to section 1708.6, observing that under the statute, it was not compelled to award attorney's fees and that its "issue" was whether Rinske would get any fees at all: "I thought this case was over-litigated. I thought it was over-litigated by both sides. [¶] I like what one juror had to say. She said—this was (Juror No. 12) who said, you know, 'The fact that the parties involved wanted to air their laundry is their business.' It was not a case that truly, I think, satisfied any governmental need or necessity to be tried. It was a particularly—it was really just a family law case gone bad with two people that don't like each other and continue to handle this in family law. [¶] There were tactics in the trial that I thought were interesting. . . . [¶] I mean, there were a lot of issues in this by both sides. There were some antics that went on; I didn't like them. But that being said, now I have to decide this issue of attorney's fees. So tell me why I should award attorney's fees."

As Rinske's counsel began to reply with an acknowledgment that fees were discretionary, the court interrupted, stating, "You agree I have discretion; I don't have to award a nickel." Rinske's counsel responded affirmatively, and the court continued: "You have to understand, we deal with domestic violence everyday in this court. And I mean domestic violence where people are being beaten, struck, hit, stabbed, maimed, gouged, and we put those poor people into shelters to protect them from their aggressors. These poor victims, we take care of them and we counsel them, we find them places that they can go rather than have them stay in their cars overnight and hide from their aggressors. All right? Those are domestic violence cases of which you speak. This is slightly different."

Rinske's counsel disagreed, contending that what Rinske suffered at Rick's hands "is up there with any of them." The court countered, "I'll just say this one more time: This barely made it as a domestic violence case. I almost granted the directed verdict. Frankly, you could have tried it as a sexual battery. You could have tried it under those three causes of action. It barely made it under the wire. The fact that the jury came back

28

with a verdict that they did shows the jury, perhaps, you know, broadened the scope and was willing to look at the angles that you were presenting. All right? There were things that were not presented as I've already articulated that I think would have changed some of their minds."

Rinske's counsel responded that, given the court's denial of Rick's motions, Rinske had a right to try her case to a jury. Rick responded by turning it into a dog fight, so she was forced to zealously litigate it.

Once again, the court expressed its opinion that "this was barely a domestic violence case under the law. It just made it. Okay? And, thus, that's something that one has to consider, one has to consider the aspects of the defense's arguments that I should, at least, reduce it by three quarters. Also, I have to look at the type of case this was, how it was handled. I thought it was over-litigated by both sides. Yes, this was an incredible fight between two people. And this was demonstrated by the fact that I have jurors that call it 'airing their dirty laundry.' People did not want to hear this. People felt beyond [*sic*] that which belongs in a court room. It was something of dirty laundry that we don't regularly see in a court of law other than, perhaps, the Family Law Division."[10]

With that, the court denied Rick's request for new trial and Rinske's motion for attorney's fees, and took Rick's motion to tax costs under submission.

**D.    Orders Denying Fee Motion and Granting in Part the Motion to Tax Costs**

On December 12, 2011, the trial court entered its order on Rick's motion to tax costs, granting it in part as follows: service of process fees of $174 (item 5); expert witness fees of $86,297 (item 8); court reporter fees of $2,000 (item 12); and additional expenses in the amount of $29,532.75 (item 13), for a total amount taxed of $118,003.75. The court denied Rick's request to tax deposition costs of $17,280 (item 4).

_____

[10] We take exception with the trial court's representation that "jurors" considered the case to be about Rick and Rinske "airing their dirty laundry." The court was merely echoing the opinion of one dissenting juror, an opinion clearly not shared by the 10 jurors who returned a verdict in Rinske's favor and awarded her $405,000.

On December 22, 2011, the court entered an amended judgment awarding Rinske $17,270 in costs.

On January 11, 2012, the trial court entered an order denying Rinske's motion for attorney's fees. The two-page order stated that "[t]he Court determined that it has sole discretion under Civil Code section 1708.6 whether to award attorney's fees to plaintiff and, if so, to what extent. In its sole discretion, the court declines to award any attorneys' fees to plaintiff."

Rinske appealed from the order denying her motion for attorney's fees, the order granting in part Rick's motion to tax costs, and the amended judgment entered on December 22, 2011.

## E. Standard of Review

Section 1708.6, subdivision (c) provides: "The court, in an action pursuant to this section, may grant to a prevailing plaintiff equitable relief, an injunction, costs, and any other relief that the court deems proper, including reasonable attorney's fees." A permissive fee provision (i.e., the court "may" awards fees) such as this grants the trial court the discretion to award fees to the prevailing party. (Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2013) ¶ 1:287, p. 1-50.14.) Where the trial court has discretion to award attorney's fees, we will not disturb the trial court's decision absent an abuse of that discretion. (*Carpenter & Zuckerman, LLP v. Cohen* (2011) 195 Cal.App.4th 373, 378; *Moran v. Oso Valley Greenbelt Assn.* (2001) 92 Cal.App.4th 156, 160.) "We will overturn such an order only if, considering all of the evidence viewed most favorably in its support and indulging all reasonable inferences in its favor, no judge could reasonably make the order." (*In re Marriage of Corona* (2009) 172 Cal.App.4th 1205, 1225–1226.)

Despite the above standard, Rinske urges that we review the trial court's order de novo, which she contends is the applicable standard of review here because the trial court misconstrued the domestic violence statute and thus failed to apply the proper legal standard. As she explains it, while a trial court typically has discretion to deny an award of statutory attorney's fees, the court here only had discretion to deny her fee request if

30

Rick demonstrated that special circumstances rendered a fee award unjust. This standard derives from *Newman v. Piggie Park Enterprises, Inc.* (1968) 390 U.S. 400, 402-403, where the court considered a fee award under Title II of the Civil Rights Act of 1964, 42 United States Code section 2000a-3(b). The California Supreme Court later adopted the same standard in *Serrano v. Unruh* (1982) 32 Cal.3d 621, a case involving an equal protection challenge and a claim for attorney's fees under California's private attorney general statute (Code Civ. Proc., § 1021.5). It has subsequently been extended to cases involving certain other statutory fees provisions, including claims under the Brown Act (Gov. Code, § 54950 et seq.) (*Los Angeles Times Communications LLC v. Los Angeles County Board of Supervisors* (2003) 112 Cal.App.4th 1313, 1327; *Common Cause v. Stirling* (1981) 119 Cal.App.3d 658); the Political Reform Act of 1974 (Gov. Code, § 81000 et seq.) (*Thirteen Committee v. Weinreb* (1985) 168 Cal.App.3d 528); and state and federal antidiscrimination laws (*Christianburg Garment Co. v. EEOC* (1978) 434 U.S. 412, 416 [action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e et seq.]; *Chavez v. City of Los Angeles* (2010) 47 Cal.4th 970 [fee claim made pursuant to the Fair Employment and Housing Act (FEHA); *Flannery v. Prentice* (2001) 26 Cal.4th 572, 584 [same]; *Young v. Exxon Mobil Corp.* (2008) 168 Cal.App.4th 1467, 1474 [same]).

Conceding that there are no cases applying this standard to a domestic violence claim under section 1708.6, Rinske urges us to adopt it here because, like the situations above, domestic violence claims serve an important public interest and advance a significant public policy. She argues that they are similar to employment discrimination cases brought under FEHA because "[b]oth are civil rights legislation enacted not just to provide remedies for individuals but to address significant public problems." Further, she argues that "[w]ithout such an award, the overwhelming majority of domestic violence victims will effectively be denied access to civil remedies, especially where the victim lacks financial resources," and the legislative intent to fully compensate victims of domestic violence will be thwarted. By prevailing on her domestic violence claim against Rick, she vindicated an important statutory right and furthered the public interest.

31

We recognize the severity of the domestic violence Rinske was subjected to by Rick. As to that, we wholeheartedly disagree with the trial court's characterization of the case as "not a serious matter." And as detailed above, we reject Rick's contention—and apparently the view of the trial court—that Rinske alleged a cause of action for sexual battery but not domestic violence. But be that as it may, Rinske's lawsuit against Rick did not serve a public purpose, nor did it advance a significant public interest. It was a private dispute between two individuals, a dispute in which Rinske was vindicated by a sizable jury verdict. We therefore decline Rinske's invitation to extend the standard reserved for public interest litigation to her case.

**F. Due to a Misunderstanding of the Applicable Law, the Trial Court Abused Its Discretion In Ruling On Rinske's Motion for Attorney's Fees**

As quoted in detail above, at the hearing the trial court essentially offered only one reason for denying Rinske's fee request: it doubted that Rinske's allegations that Rick drugged and raped her constituted domestic violence, repeatedly stating that her evidence was more suited for a sexual battery claim. But in rejecting Rick's challenge to the jury's verdict, *ante*, we held, consistent with *Pugliese v. Superior Court, supra,* 146 Cal.App.4th 1444, 1448-1449, that sexual battery is within the definition of domestic violence. Thus, the trial court's denial of Rinske's request for fees was based on a misunderstanding of law.[11]

Where the trial court misunderstands the applicable law, its decision falls outside the scope of discretion. As the court in *Horsford v. Board of Trustees of California State Univ.* (2005) 132 Cal.App.4th 359, 393, explained: "It is often said that a trial court's exercise of discretion will be reversed only if its decision is 'beyond the bounds of reason.' [Citation.] This description of the standard is complete, however, only if 'beyond the bounds of reason' is understood as something in addition to simply

_____

[11] We struggle to understand how the court could rely on its belief that Rinske did not allege a claim for domestic violence to deny her fee request while at the same time denying Rick's motion for new trial, as well as his prior motions for a directed verdict and for judgment notwithstanding the verdict, all of which were grounded in his theory that Rinske alleged a claim for sexual battery but not domestic violence.

32

'irrational' or 'illogical.' While an irrational decision would usually constitute an abuse of discretion, the legal standard of review encompasses more than that: 'The scope of discretion always resides in the particular law being applied, i.e., in the "legal principles governing the subject of [the] action . . . .' Action that transgresses the confines of the applicable principles of law is outside the scope of discretion and we call such action an "abuse" of discretion.' [Citation.] For example, a court could be mistaken about the scope of its discretion and the mistake could be entirely 'reasonable'—that is, it adopts a position about which reasonable judges could differ. But a reasoned decision based on the reasonable view of the scope of discretion is still an abuse of judicial discretion when it starts from a mistaken premise, even though nothing about the exercise of discretion is, in ordinary-language use of the phrase, 'beyond the bounds of reason.' [Citation.] In other words, judicial discretion must be measured against the general rules of law and, in the case of a statutory grant of discretion, against the specific law that grants the discretion." (See also *Lealao v. Beneficial California, Inc.* (2000) 82 Cal.App.4th 19, 25 [" '[T]he scope of discretion always resides in the particular law being applied, i.e., in the "legal principles governing the subject of [the] action . . . ." Action that transgresses the confines of the applicable principles of law is outside the scope of discretion and we call such action an "abuse" of discretion.' "]; *Thayer v. Wells Fargo Bank, N.A.* (2001) 92 Cal.App.4th 819, 833.)

In sum, we conclude that the trial court denied Rinske's motion for attorney's fees based on a misunderstanding of the law and that it thus abused its discretion. Its order denying her fee motion is therefore reversed, and we remand the matter to the trial court to reconsider Rinske's request for fees in light of the law set forth above.

### G. To the Extent the Trial Court Taxed Rinske's Costs Based on Its Misunderstanding of Section 1708.6, It Must Likewise Reconsider Its Ruling on Rick's Motion to Tax Costs

Rinske sought to recover numerous categories of costs based on the provision in section 1708.6 that the trial court "may grant to a prevailing plaintiff . . . any other relief that the court deems proper" in addition to equitable relief, an injunction, costs, and

reasonable attorney's fees. These categories included expert witness fees, jury consultant fees, a private investigator, travel expenses for an out-of-town witness, and miscellaneous other costs. The court granted Rick's motion to tax these costs, although it did not set forth its basis for doing so. To the extent the court denied these costs based on its misunderstanding of the scope of section 1708.6, we remand for the court to reconsider Rinske's requested costs in light of the foregoing.

In doing so, the trial court should bear in mind what appear to be two errors, one in the order granting Rick's motion to tax and the other in the amended judgment. First, the court taxed Rinske's "other" expenses (item 13) in the amount of $29,532.75, but Rick only sought to tax "other" expenses in the amount of $29,257.75—$275 less than the amount the court actually taxed. It appears that the court's number was incorrect. Rinske itemized "other" expenses on Attachment 13 (totaling $5,678.25) and Attachment 13A (totaling $29,532.75). The court appears to have erroneously taxed the total amount requested on Attachment 13A, rather than the specific items on Attachments 13 and 13A that Rick sought to tax.

Additionally, the trial court's order taxed $118,003.75 in requested costs but denied Rick's request to tax deposition costs of $17,280. By our calculation, that left Rinske with recoverable costs in the amount of $37,618.25. Despite this, the amended judgment awarded her only $17,280, a number apparently erroneously derived from the court's order denying Rick's request to tax deposition costs in that amount.

**H. Rinske's Request for Judicial Notice is Granted**

Rinske's unopposed request for judicial notice is granted.

34

## DISPOSITION

The judgment is affirmed.  The orders denying attorney's fees and on the motion to tax costs are reversed, and the matter remanded for the trial court to reconsider Rinske's motion for attorney's fees and Rick's motion to tax costs in a manner consistent with the foregoing.  Rinske is awarded her costs on both appeals.


_____

Richman, J.


We concur:


_____

Kline, P.J.


_____

Lambden, J.